******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DENISE EMERICK *v.* ROGER EMERICK
(AC 38258)

Beach, Sheldon and Flynn, Js.*

*Argued October 20, 2016—officially released January 31, 2017*

(Appeal from Superior Court, judicial district of
Hartford, Ficeto, J.)

*Roger Emerick*, self-represented, the appellant
(defendant).

*Jon T. Kukucka*, with whom were *Johanna S. Katz*,
and, on the brief, *Campbell D. Barrett*, for the appel-
lee (plaintiff).

*Opinion*

FLYNN, J. In this marital dissolution action, the self-represented defendant, Roger Emerick, appeals from the judgment of the trial court, *Ficeto, J.*, claiming that the court (1) demonstrated bias against him on the basis of his gender and status as a self-represented party; (2) abused its discretion in awarding the plaintiff, Denise Emerick, $100,000 in lump sum alimony and in distributing the marital property; (3) improperly denied his request for an order regarding the plaintiff's grandchildren; (4) improperly denied his request for a jury trial; and (5) improperly denied his motions for reargument and for a mistrial. We find none of these claims persuasive and, accordingly, affirm the judgment of the trial court.

The following facts, as found by the court in its memorandum of decision, and procedural history are relevant to this appeal. The parties were married on February 11, 1994. At the time their marriage was dissolved, which occurred by judgment of the court more than twenty-one years later on June 25, 2015, both parties were sixty-five years old. Throughout the marriage, the plaintiff earned a modest income as a self-employed typist and bookkeeper, with her "best" year occurring prior to the marriage, in 1992, when she earned approximately $30,000. She retired in 2013, and during her last three years of employment earned an income that was in "the teens." At the time of dissolution, the plaintiff received $241.38 per week in social security benefits and $400 per week in pendente lite alimony. As a result of spinal fusion surgery she had undergone in October of 2012 that did not heal properly, the plaintiff experienced pain in her hands and arms. The plaintiff also was diagnosed with recurring "panic attacks" in 1996, and takes a multitude of prescription medications to manage the panic attacks and her pain. The defendant was employed as an engineer at the time of dissolution and earned a net income of $1462 per week. He was in good health and desired to retire.

The defendant owned the marital home, located at 580 Hopewell Road in South Glastonbury, prior to the marriage. While the plaintiff and the defendant did not have children, the plaintiff was the primary caregiver for an assortment of family members who came to reside in the marital home, some of whom were more than ninety years old and required constant care. At some point during the marriage, the plaintiff's daughter and her two children began residing in the marital home.[1]

In 1996, the parties constructed a substantial addition to the marital home in order to accommodate the plaintiff's mother. The plaintiff's mother paid for the renovations, which cost $212,000 and added an 850 square foot apartment and bedroom suite to the home. The

value of the marital home, which was owned exclusively by the defendant, significantly appreciated as a result of the construction financed by the plaintiff's mother.[2]

In addition to her role as caregiver, the plaintiff handled the family's finances. She paid the bills, handled some of the investments, and prepared federal and state tax filings. The defendant was unemployed for a period of time in the mid to late 1990s.[3] While the defendant was unemployed, the plaintiff's mother contributed her social security benefits plus an additional $70 per month to pay for the family's household expenses. The defendant began day trading in 1999, and financed the endeavor with $175,000 in credit card debt and by taking out a line of credit on the marital home. He lost the entire $175,000. The plaintiff and the defendant repaid the $175,000 debt over the course of nine years, in part with a $66,000 contribution from the plaintiff's mother.[4]

Over time, the marriage began to deteriorate. The defendant lived a "very structured" and "routine based" life, which took its toll on the plaintiff. The defendant also was generally unsupportive of the plaintiff. In 2013, the plaintiff disclosed to the defendant that she had been sexually abused as a child, to which the defendant "had no real response" and "was indifferent." After the plaintiff's spinal surgery in 2012, the defendant was "shocked" that the plaintiff had decided to retire and that she had hired a maid to help clean the marital home. Following two physical altercations between the parties in late-2012 and mid-2013, the plaintiff resolved to leave the marriage. In both incidents, the defendant grabbed and pulled the plaintiff's wrists and hands, which, due to her surgery, caused her severe pain. On March 18, 2014, after surreptitiously purchasing a home at 15 Briarwood Road in West Hartford, the plaintiff informed the defendant that she was leaving him. The plaintiff commenced this dissolution action on June 3, 2014.

On June 25, 2015, following a two day trial, the court entered judgment dissolving the marriage on the ground of irretrievable breakdown, finding that the breakdown was primarily the fault of the defendant. As to the approximate value of the plaintiff's assets at the time of dissolution, the court found that her West Hartford home was valued at $232,500 and that she had bank accounts totaling $14,700, a bond in the amount of $8000, and $334,111 in retirement assets. With respect to the defendant's assets, the court found that his Glastonbury residence, to which the plaintiff did not make any claim in the dissolution proceeding, had an approximate value of $654,200.[5] The defendant also had $277,000 in a checking account and approximately $653,365 in retirement assets, including a 401 (K) plan valued at $375,153 and an individual retirement account (IRA) valued at $22,270. In its financial orders, the court awarded the plaintiff lump sum alimony in the amount

of $100,000, payable in four $25,000 installments, and further ordered the defendant to transfer to the plaintiff all sums in his 401 (K) plan and IRA, which totaled $397,423. The court declined to award periodic alimony.

On July 24, 2015, the defendant filed a "motion to reargue/reconsider" and a motion for a mistrial. The court denied both motions. This appeal followed. Additional facts and procedural history will be set forth where necessary.

I

The defendant's first claim is that the court was biased against him, and in favor of the plaintiff, on the basis of his gender and status as a self-represented party. We disagree.

As an initial matter, the defendant has failed to comply with Practice Book § 1-23, which provides in relevant part that "[a] motion to disqualify a judicial authority shall be in writing and shall be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification and a certificate of the counsel of record that the motion is made in good faith." This court has held that § 1-23 "creates a mandatory procedure to be followed by any party seeking to recuse a judge . . . and, if a party fails to follow such procedures, the record is deemed to be inadequate for our review because [the procedures] are a condition precedent to a hearing on a judge's disqualification." (Citation omitted; internal quotation marks omitted.) *Olson* v. *Olson*, 71 Conn. App. 826, 830, 804 A.2d 851 (2002). Despite raising the issue of judicial bias at several junctures during trial, the defendant never filed a written motion to disqualify the court in accordance with § 1-23.[6] Thus, the defendant has not provided us with an adequate record to review this claim.

While that procedural deficiency is reason enough to reject the defendant's claim, given the grave nature of his accusation, we, as this court did in *Wendt* v. *Wendt*, 59 Conn. App. 656, 693, 757 A.2d 1225, cert. denied, 255 Conn. 918, 763 A.2d 1044 (2000), address the substance of the claim. "The standard to be employed when determining whether a judge should recuse herself or himself pursuant to canon 3 (c) [of the Code of Judicial Conduct] is well established. The standard . . . is an objective one [meant to assess] whether [the judge] can be fair and impartial in hearing the case. . . . Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard. . . . The question is not whether the

judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question [the judge's] . . . impartiality, on the basis of all of the circumstances." (Internal quotation marks omitted.) *Mercer* v. *Cosley*, 110 Conn. App. 283, 291, 955 A.2d 550 (2008).

The defendant has not offered a scintilla of evidence to support his claim of judicial bias. Instead, the defendant simply asserts that he is a male, self-represented party, that the court was female, and that the court entered financial and other orders and made credibility determinations with which he does not agree. Our common law and statutory law have always authorized a single Superior Court judge to preside over the trial of marriage dissolution cases. Some marriages in our state, like the defendant's, are contracted between persons of the opposite sex. In such situations, the mere fact that the trial judge is of the same sex as one of the parties is not evidence of bias against the other. The mere fact that a trial judge is of a sex different from one of the litigants could not lead a reasonable person to question the judge's impartiality. Our careful review of the record and the defendant's brief does not point to any predisposition on the part of the court against persons who appear in court on their own behalf.

On May 13, 2015, the first day of trial, the defendant sought to renew a recusal motion made before Judge Albis, a prior judge in the case who presided over the defendant's motion to disqualify Judge Simon and Judge Bozzuto. Judge Ficeto permitted him to do so. The defendant argued to Judge Ficeto: "For my part I feel in general, *I've never met you*, but I feel in general [that the] trial court is bias[ed] against self-represented male parties. I consider it the slaughterhouse . . . ." (Emphasis added.) This statement demonstrates that the defendant's claim of judicial bias is based upon the perceived conduct of other judges who presided over earlier proceedings in the case, rather than on Judge Ficeto's conduct. Such generalized concerns would not lead a reasonable person to question the court's impartiality to those of a different sex who appear before it on their own behalf without the benefit of counsel.

The defendant fares no better with respect to his assertion that the court demonstrated judicial bias by awarding alimony and distributing the marital property in a manner that was adverse to him. When the defendant moved to disqualify the court prior to the start of the second day of trial on May 14, 2015, the court had not yet issued any orders that were adverse to the defendant. The simple fact that, at the conclusion of the trial, the court declined to issue financial orders that were more favorable to the defendant does not evidence judicial bias or prejudice against the defendant. See *McKenna* v. *Delente*, 123 Conn. App. 137, 145, 1 A.3d 260 (2010) (rejecting claims of prejudice and

judicial bias where they "amount[ed] to nothing more than a collateral attack on the financial orders issued in connection with the dissolution judgment"). The court's several other rulings and credibility determinations that the defendant disagrees with likewise do not evidence judicial bias. "It is an elementary rule of law that the fact that a trial court rules adversely to a litigant, even if some of these rulings were to be determined on appeal to have been erroneous, does not demonstrate personal bias." (Internal quotation marks omitted.) *Wendt* v. *Wendt*, supra, 59 Conn. App. 694. "Obviously, if a ruling against a party could be used as . . . indicia of bias, at least half of the time, every court would be guilty of being biased against one of the two parties. . . . The fact that the plaintiff strongly disagrees with the substance of the court's rulings does not make those rulings evidence of bias."[7] (Citation omitted; internal quotation marks omitted.) *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 317, 991 A.2d 666, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010).

It is a trial court's function to decide issues of credibility. Put simply, in situations in which the court is acting as the fact finder and there is conflicting evidence as to an issue of fact, the court is charged with evaluating and determining which evidence is more credible, and the mere fact that the court makes such a finding in favor of one party does not form the basis for a challenge to the court's impartiality by the other. The defendant's claims of bias are without merit.

II

The defendant next claims that the court abused its discretion in awarding the plaintiff $100,000 in lump sum alimony, and in distributing the marital property. We disagree with both claims.

"The standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Therefore, to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the

law or could not reasonably conclude as it did." (Citations omitted; internal quotation marks omitted.) *Demartino* v. *Demartino*, 79 Conn. App. 488, 492–93, 830 A.2d 394 (2003).

At the outset, we note that the defendant's claims of error with respect to the court's financial orders are based in large part on his belief that the court erred in not crediting his testimony over that of the plaintiff with respect to the valuation of the plaintiff's assets, her contribution to the marital estate, and the events that contributed to the deterioration of their marriage. It is well established, however, "that the evaluation of a witness' testimony and credibility are wholly within the province of the trier of fact. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Citation omitted; internal quotation marks omitted.) *Schoenborn* v. *Schoenborn*, 144 Conn. App. 846, 851, 74 A.3d 482 (2013). Thus, while we may review the court's underlying factual determinations under the clearly erroneous standard, our standard of review requires us to defer to the court's evaluation of the plaintiff's credibility relative to that of the defendant.[8] See, e.g., *Jalbert* v. *Mulligan*, 153 Conn. App. 124, 138, 101 A.3d 279 ("At its essence, the defendant's claim asks this court to engage in an independent review of the credibility of the respective parties. That we cannot do."), cert. denied, 315 Conn. 901, 104 A.3d 107 (2014). With that in mind, we address, in turn, the defendant's claims regarding the court's award of alimony and distribution of the marital property.

A

General Statutes § 46b-82 governs awards of alimony. That section requires the trial court to consider "the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81 . . . ." General Statutes § 46b-82 (a). "In awarding alimony, [t]he court must consider all of these criteria. . . . It need not, however, make explicit reference to the statutory criteria that it considered in making its decision or make express findings as to each statutory factor." (Emphasis omitted; internal quotation marks omitted.) *Dees* v. *Dees*, 92 Conn. App. 812, 820, 887 A.2d 429 (2006). "The trial court may

place varying degrees of importance on each criterion according to the factual circumstances of each case." (Internal quotation marks omitted.) Id., 821.

We conclude that the court did not abuse its discretion in awarding $100,000 in lump sum alimony to the plaintiff. In its memorandum of decision, the court stated that it fashioned the alimony award on the basis of all of the evidence admitted at trial and the statutory criteria set forth in § 46b-82. In particular, the court noted the parties' lengthy twenty-one year marriage; the fact that the defendant was college educated and healthy whereas the plaintiff was retired from the workforce and was hindered by her anxiety and complications from spinal surgery; and the defendant's relatively steady employment throughout the marriage compared with the modest income earned by the plaintiff. The court also indicated that, while it was inclined to award periodic alimony to the plaintiff, lump sum alimony better accommodated the defendant's desire to retire because "[l]ump sum alimony, unlike periodic alimony, is a final judgment which cannot be modified even should there be a substantial change in circumstances." (Internal quotation marks omitted.) *Tremaine* v. *Tremaine*, 235 Conn. 45, 58–59, 663 A.2d 387 (1995). In light of this analysis, we conclude that the court's alimony award was properly based upon an application of the statutory guidelines to the facts of the case. Accordingly, there was no abuse of discretion.

The defendant argues that the court abused its discretion in issuing its financial orders because it improperly failed to consider evidence that the plaintiff had absconded with $1.3 million in marital assets. In support of this argument, the defendant cites the multitude of spreadsheets and documents that he prepared and that were admitted into evidence at trial. In its memorandum of decision, however, the court indicated that it *had* considered the spreadsheets and related evidence but that the defendant's "argument [was] without merit."[9] Thus, the court did not disregard the spreadsheets; it simply found that they did not persuasively support the defendant's argument that the plaintiff had hidden marital assets. "It is axiomatic that [t]he trier [of fact] is free to accept or reject, in whole or in part, the evidence offered by either party." (Internal quotation marks omitted.) *Olson* v. *Olson*, supra, 71 Conn. App. 833. The court's decision not to credit the defendant's spreadsheets was an exercise of its fact finding function. After a careful review of the record, we conclude that the court's findings that the defendant's spreadsheets were not credible, and that the plaintiff had not hidden $1.3 million in marital assets, were not clearly erroneous. See *Demartino* v. *Demartino*, supra, 79 Conn. App. 492 ("[t]he trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole" [internal quotation marks omitted]). At trial,

the plaintiff testified that she had never hidden, and was not currently hiding, any marital property. Although, in the defendant's view, his spreadsheets disproved that testimony, it is unclear from the spreadsheets and the defendant's testimony in connection with them precisely how the defendant arrived at his conclusion that $1.3 million in marital assets were unaccounted for. In particular, the spreadsheets do not appear to account for *all* of the expenses incurred by the plaintiff over the parties' twenty-one year marriage, which could substantially alter the defendant's computation of "missing" assets. Accordingly, the court was well within its discretion in rejecting the defendant's spreadsheets as unreliable.

B

We are also not persuaded that the court abused its discretion in distributing the marital property. The distribution of assets in a dissolution action is governed by General Statutes § 46b-81, which provides in pertinent part that a trial court "may assign to either spouse all or any part of the estate of the other spouse ." General Statutes § 46b-81 (a). "In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates." General Statutes § 46b-81 (c). "Courts are not required to ritualistically recite the criteria they considered, nor are they bound to any specific formula respecting the weight to be accorded each factor in determining the distribution of marital assets." (Internal quotation marks omitted.) *Mann* v. *Miller*, 93 Conn. App. 809, 812, 890 A.2d 581 (2006).

Here, the court ordered both parties to retain ownership over the marital assets in their respective possessions, except that the defendant was ordered to transfer $397,423 of his $653,365 in retirement assets to the plaintiff.[10] We disagree that this order constituted an abuse of discretion. The court emphasized in its memorandum of decision that its distribution of the marital property was based upon the factors set forth in § 46b-81. We note that the court permitted the defendant to retain ownership of the marital home, the value of which, the court found, had been significantly enhanced by a $212,000 addition financed by the plaintiff's mother. The court further found that the defendant was primarily at fault for the breakdown of the marriage.[11] Additionally, in issuing the alimony award, the court noted

the length of the marriage and the plaintiff's retirement from the workforce, modest employment throughout the marriage, and diminished physical condition, all of which support the conclusion that the plaintiff's earning capacity at the time of dissolution was significantly less than that of the defendant, who remained in good health and was employed as an engineer. The court's consideration of those factors in awarding alimony, which apply with equal force to the asset distribution calculus, in combination with its other factual findings, convinces us that the court adequately considered and weighed the factors set forth in § 46b-81, and, thus, did not abuse its discretion in transferring a portion of the defendant's retirement assets to the plaintiff.

### III

The defendant next claims that the court improperly refused to order the plaintiff to provide him with periodic updates regarding the well-being of the plaintiff's grandchildren. We disagree.

In the defendant's proposed orders, the defendant sought an order requiring the plaintiff to "have [her grandchildren] send a short note to [the] [d]efendant telling [the defendant] how they are doing," or, in the alternative, requiring the plaintiff to send the defendant a monthly "e-mail or letter . . . with any updates on them." The court denied the request in its memorandum of decision, noting the lack of evidence at trial regarding the age of the plaintiff's grandchildren, their relationship to the defendant or whether their parents consented to their continued contact with the defendant. The court also observed that the plaintiff was not the custodian of the grandchildren and thus lacked authority to compel them to write the defendant.

We live in an age where many families are blended and where children of one spouse may not be children of the other. The marriage of the plaintiff and defendant was one in which the plaintiff's grandchildren were not the blood descendants of the defendant. The defendant has expressed an abiding, avuncular concern and affection in his briefs and at oral argument before this court for the plaintiff's grandchildren, who lived with the parties in the marital home for a period of time during the marriage. The defendant believes his relationship with the grandchildren should not end simply because his marriage with the plaintiff ended in divorce. We do not denigrate the importance that the defendant places on this issue. We conclude, however, that the court did not err in concluding that the plaintiff was not the custodian of her grandchildren and, thus, that the plaintiff lacked authority to compel her grandchildren to continue contacting the defendant, or to provide the defendant with periodic updates concerning the well-being of her grandchildren.

The United States Supreme Court held in *Troxel* v.

*Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), that the due process clause of the fourteenth amendment to the United States constitution "does not permit a [s]tate to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." Id., 72–73. *Troxel* arose out of a situation in which grandparents were denied continued contact and visitation with their grandchildren following the death of one of their grandchildren's parents. Id., 61. Our Supreme Court has held that, under the federal due process clause, parents have "the fundamental right . . . to raise their children as they see fit . . . ." *Roth* v. *Weston*, 259 Conn. 202, 216, 789 A.2d 431 (2002). "[A]mong those interests lying at the core of a parent's right to care for his or her own children is the right to control their associations. . . . The essence of parenthood is the companionship of the child and the right to make decisions regarding his or her care, control, education, health, religion and association." (Citation omitted.) Id., 216–17. In the present case, there was no evidence that the parents of the plaintiff's grandchildren consented to their continued contact with the defendant or to the plaintiff's provision of information about them to the defendant. Significantly, there also was no evidence that the plaintiff had any authority over the plaintiff's grandchildren by any award of custody. In light of this record, we see no basis for concluding that the court erred in failing to grant the defendant's proposed order regarding the plaintiff's grandchildren.

IV

The defendant next claims that the court erred in denying his request for a jury trial. It is well settled, however, that "there is no right to a jury trial in an equitable action. . . . Whether the right to a jury trial attaches in an action presenting both legal and equitable issues depends on the relative importance of the two types of claims. . . . In an action that is essentially equitable, the court may determine incidental issues of fact without a jury." (Citations omitted.) *Gaudio* v. *Gaudio*, 23 Conn. App. 287, 301, 580 A.2d 1212, cert. denied, 217 Conn. 803, 584 A.2d 471 (1990). "A dissolution of a marriage is essentially an equitable action." Id., 302. Here, because the plaintiff's cause of action sought only a dissolution of her marriage, together with alimony and an equitable division of property, her cause of action is essentially equitable, for which the defendant has no right to a trial by jury. Accordingly, the defendant's claim lacks merit.

V

The defendant's final claim is that the court improperly denied his motions for reargument and for a mistrial. On July 24, 2015, the defendant filed a motion to "reargue/reconsider" the court's June 25, 2015 judgment of dissolution, and a motion for a mistrial. The court

denied both motions on August 4, 2015.

As to the defendant's motion to "reargue/reconsider," "[t]he standard of review for a court's denial of a motion to . . . reargue is abuse of discretion." *Terry* v. *Terry*, 102 Conn. App. 215, 230, 925 A.2d 375, cert. denied, 284 Conn. 911, 931 A.2d 934 (2007). "[T]he purpose of a reargument is . . . to demonstrate to the court that there is some decision or some principle of law which would have a controlling effect, and which has been overlooked, or that there has been a misapprehension of facts. . . . It also may be used to address . . . claims of law that the [movant] claimed were not addressed by the court. . . . [A] motion to reargue [however] is not to be used as an opportunity to have a second bite of the apple . . . ." (Internal quotation marks omitted.) *Von Kohorn* v. *Von Kohorn*, 132 Conn. App. 709, 714, 33 A.3d 809 (2011). In the present case, the defendant's motion does not identify any principle of law or fact that the court had not previously considered at trial. Rather, the motion simply alleges that the court was incorrect in rendering its factual findings, credibility determinations, and financial orders. Therefore, the court did not abuse its discretion in denying the motion.

Finally, "[t]he trial court has wide discretion in deciding a motion for a mistrial. . . . The denial of a motion for a mistrial will be reversed only if the trial court abused its discretion by denying the motion. . . . [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial and the whole proceedings are vitiated." (Citations omitted; internal quotation marks omitted.) *Matza* v. *Matza*, 226 Conn. 166, 190–91, 627 A.2d 414 (1993). Our review of the defendant's motion discloses nothing that warranted a mistrial. It is simply a reiteration of the same challenges to the court's financial orders that were resolved at trial and the defendant's claim of judicial bias. Thus, the court acted within its discretion in denying the defendant's motion for a mistrial.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The court found that one of the plaintiff's grandchildren resided with the parties during 2003. The court did not find and the record does not indicate how long the plaintiff's grandchildren resided with the parties during the course of the marriage.

[2] The plaintiff testified at trial that the addition financed by her mother "doubled the size" of the marital home.

[3] At trial, the plaintiff testified that the defendant was unemployed from approximately 1995 through 1999, whereas the defendant testified that he was unemployed for only one year. The court noted the conflicting testimony but did not make a finding.

[4] While the court did not explicitly make a finding crediting this testimony in its memorandum of decision, the court noted that "[t]he plaintiff testified that approximately $270,000 of her mother's moneys were used for house-

hold expenses" during the defendant's period of unemployment. The court found that the plaintiff "inherited a total of $635,000 from her mother." Although the court's memorandum of decision is unclear as to whether it was making this finding, our review of the record reveals that the plaintiff's testimony at trial was that, in total, not including the money spent to construct the addition to the marital home, approximately $270,000 of the plaintiff's $635,000 inheritance from her mother was spent on household expenses during the defendant's period of unemployment and on paying off the defendant's day trading debt.

[5] The court found that the home at 580 Hopewell Road was valued at $369,400 and the land was valued at $284,800.

[6] On January 30, 2015, the defendant filed a motion to disqualify Judge Simon and Judge Bozzuto, on the basis of those judges' alleged bias against him. The court, *Albis, J.*, denied the motion in a memorandum of decision dated March 18, 2015. That prior motion to disqualify does not render the record adequate with respect to the defendant's present claim of judicial bias because it was directed at different judges and, thus, is separate and distinct from his present claim of bias. See *Olson* v. *Olson*, supra, 71 Conn. App. 831. Moreover, the defendant's prior motion did not comply with the dictates of Practice Book § 1-23 because it was not supported by an affidavit.

[7] The defendant further argues that the court demonstrated bias by not allowing him to read directly from one of his documentary exhibits at trial. The defendant's documentary exhibits, however, were marked as exhibits, admitted into evidence, and considered by the court in issuing its ruling. Moreover, the court noted that, by the defendant's own admission, the exhibit was cumulative of another documentary exhibit about which the defendant had already testified extensively. The court was well within its discretion in ruling that, for purposes of judicial economy, the defendant could not read directly from this second documentary exhibit at trial.

[8] While the defendant argues that the plaintiff's testimony at trial regarding the size of her estate at the time of dissolution is contradicted by her responses to interrogatories, any such discrepancy does not render any of the court's factual findings clearly erroneous. As our Supreme Court has observed, "[a]n answer filed by a party to an interrogatory has the same effect as a judicial admission made in a pleading or in open court. It relieves the opposing party of the necessity of proving the facts admitted . . . *but it is not conclusive upon him and will not prevail over evidence offered at trial.*" (Emphasis added; internal quotation marks omitted.) *Piantedosi* v. *Floridia*, 186 Conn. 275, 278, 440 A.2d 977 (1982); see also *Jewett* v. *Jewett*, 265 Conn. 669, 688–89, 830 A.2d 193 (2003).

[9] Specifically, the court stated in its memorandum of decision that "[t]he defendant testified that his wife kept meticulous records relative to income and expenditures over the course of the marriage. *He prepared detailed spreadsheets submitted at trial to 'prove' that approximately $1.3 million of marital assets remain unaccounted for. He testified that his wife schemed, prior to the marriage, to abscond with the $1.3 million.* Part of the scheme, he testified, is that his wife led a double life, possibly as a lesbian. He stated his wife has a female friend who never visited the home during the marriage and upon vacating the marital home on March 18, 2014, she resided with this female friend for several weeks prior to moving to a home she already purchased. He further proffered as evidence the fact that soon after the marriage, his wife did not initiate intimate relations. He alleged that he and the plaintiff enjoyed going for walks and singing songs and she ceased her participation in those activities. He also noted that early in the marriage the plaintiff would watch him leave for work from the marital home and wave enthusiastically. He alleged that over time, she waved only in response to his waves. He testified that the plaintiff 'didn't live up to the marital contract.' *The court finds this argument without merit.*" (Emphasis added.)

[10] More specifically, as a result of the court's financial orders, the defendant retained ownership over the marital home, valued at $654,200, the $277,000 held in his checking account, $255,942 in retirement assets, and his two automobiles, for a total value of approximately $1,190,692. As a result of the court's orders, the total approximate value of the plaintiff's estate, including the lump sum alimony award and the two-thirds of the defendant's retirement assets, is $1,095,734. Her assets consist of her West Hartford home, bank accounts, bond, 2005 Honda Accord, and $731,534 in retirement assets.

[11] Contrary to the defendant's contention, the court's finding that the defendant was primarily at fault for the breakdown of the marriage was not clearly erroneous. There was evidence that the defendant's structured and

increasingly combative personality wore on the plaintiff, and that the defendant lacked compassion toward the plaintiff, demonstrated, in part, by the defendant's indifference to the plaintiff's disclosure of past sexual abuse.

———————————————————