******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# N. R. *v.* M. P.*
## (AC 45960)

Bright, C. J., and Cradle and Seeley, Js.

*Syllabus*

The plaintiff father appealed to this court from the judgment of the trial
court awarding the defendant mother sole legal and physical custody
of their two minor children. *Held*:

1. The plaintiff could not prevail on his claim that the trial court improperly
awarded the defendant sole legal and physical custody of the children
because it failed to consider the test set forth in the statute (§ 46b-56d)
governing a parent's postjudgment relocation with a child: § 46b-56d
was inapplicable to the facts of the case because it did not involve a
postjudgment relocation, as the plaintiff filed an application seeking
joint legal custody with a shared parenting plan, the defendant filed a
cross complaint seeking sole legal custody, and, before a trial was held
and a custody determination was made, the defendant relocated to South
Carolina with the children, and, thus, the court was not required to
perform the relocation analysis set forth in § 46b-56d; moreover, it was
undisputed that the court applied the standard of the best interest of
the child as set forth in the statute (§ 46b-56) governing the custody of
minor children, the standard that governs a relocation issue that arises
prior to the time a judgment is rendered awarding custody; furthermore,
it was clear on the basis of the record and the court's factual findings,
which were not challenged on appeal, that the court considered the
impact of the children's relocation in its best interest analysis.

2. The plaintiff could not prevail on his claim that the trial court improperly
issued orders that required him to be current with his child support
obligation and to pay one half of the travel expenses for the minor
children in order to receive parenting time with the children in Connecti-
cut: this court concluded that the plaintiff's claim is an inaccurate recita-
tion of the substance of the trial court's parenting time orders, as this

---

* In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79a-12, the names of the parties involved in this
appeal are not disclosed. The records and papers of this case shall be open
for inspection only to persons having a proper interest therein and upon
order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3)
(2018), as amended by the Violence Against Women Act Reauthorization
Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to
identify any person protected or sought to be protected under a protection
order, protective order, or a restraining order that was issued or applied
for, or others through whom that person's identity may be ascertained.

court construed the parenting time orders as providing that, if the plaintiff is not current on child support, then he would bear the entire cost of the children's travel to Connecticut and, if he was current on child support, he and the defendant would share the costs equally, and the only circumstance in which the defendant was allowed to cancel a visit was if the plaintiff had not provided her with payment for his portion of the travel expenses, not if the plaintiff was not current on child support payments.

3. The plaintiff could not prevail on his claim that the trial court improperly relied on the testimony of the guardian ad litem in its analysis of the best interests of the minor children: the fact that the guardian ad litem was unable to observe a visit between the plaintiff and his children, despite clear efforts made to do so, did not render the guardian ad litem unable to issue recommendations to the court, nor did it make it improper for the court to rely on those recommendations; moreover, the guardian ad litem investigated the facts necessary to make recommendations to the court related to custody and parenting time and received updates from a third-party supervisor who had observed the plaintiff's visits with the children; furthermore, given that the guardian ad litem testified at a hearing and was subject to cross-examination by the parties, the court was able to consider the basis for the guardian ad litem's observations and recommendations and to afford them whatever weight it deemed appropriate.

Argued May 16—officially released September 3, 2024

*Procedural History*

Application for custody of the parties' minor children, and for other relief, brought to the Superior Court in the judicial district of Waterbury, where the defendant filed a cross complaint; thereafter, the matter was tried to the court, *Parkinson, J.*; judgment granting, inter alia, sole legal and physical custody of the parties' minor children to the defendant, from which the plaintiff appealed to this court. *Affirmed.*

*David V. DeRosa*, for the appellant (plaintiff).

*Justine Rakich-Kelly*, guardian ad litem, for the minor children.

*Opinion*

SEELEY, J. The plaintiff, N. R.,[1] appeals from the judgment of the trial court awarding the defendant, M.

---

[1] Although N. R. is the plaintiff in the underlying matter in this appeal, this opinion also discusses a previous custody application filed by M. P., in

P.,[2] sole legal and physical custody of their two minor children. On appeal, N. R. claims that the court improperly (1) awarded M. P. sole legal and physical custody of the children, (2) issued an order that, if N. R. is not current on child support, he must share one half of the travel expenses for the minor children to visit him in Connecticut, and (3) relied on the testimony of the guardian ad litem in its analysis of the best interests of the minor children. We disagree and, therefore, affirm the judgment of the court.

The following facts and procedural history are relevant to our resolution of the present appeal. N. R. and M. P. began a romantic relationship in June, 2016. They have two minor children, born in May, 2017, who are twins. N. R. was incarcerated from the end of 2017 through March, 2020. The parties continued their relationship throughout the period during which N. R. was incarcerated. After N. R. was released from prison, he lived with M. P. and the children. The relationship, however, became increasingly volatile, leading N. R. and M. P. to end their relationship in September, 2020, with the children continuing to reside with M. P.

On September 21, 2020, M. P. filed an application for custody, seeking sole legal custody of the children. M. P. also filed an application for an emergency ex parte

which she was the plaintiff and N. R. was the defendant. For ease of discussion, we refer to each of the parties by their initials, instead of as the plaintiff or the defendant.

[2] M. P. did not file a brief in this appeal. Consequently, on January 19, 2024, this court issued an order stating that "the appeal shall be considered on the basis of [N. R.'s] brief, the record, as defined by Practice Book [§] 60-4, and oral argument . . . ." On April 1, 2024, The Children's Law Center of Connecticut, Inc., the guardian ad litem in this case, filed a motion seeking permission to file a late brief. The guardian ad litem stated that, "[u]pon review, it appeared the best interest of the child standard as well as the role of the guardian ad litem were implicated in the arguments put forth by [N. R.]." On April 11, 2024, this court granted the guardian ad litem permission to file a late brief by May 3, 2024. The guardian ad litem timely filed its brief on that date and participated in oral argument before this court.

order of custody of the children pursuant to General Statutes § 46b-56f.[3] M. P. requested that N. R. have no contact or visitation with the children.[4] That same day, the court, *Ficeto, J.*, granted M. P.'s application for an emergency ex parte order of custody and awarded temporary custody of the children to M. P. The court also scheduled a hearing on its ex parte order for October 1, 2020. Following the October 1, 2020 evidentiary hearing, the court, *Coleman, J.*, granted M. P.'s application for an emergency ex parte order of custody. The

[3] General Statutes § 46b-56f provides in relevant part: "(a) Any person seeking custody of a minor child pursuant to section 46b-56 or pursuant to an action brought under section 46b-40 may make an application to the Superior Court for an emergency ex parte order of custody when such person believes an immediate and present risk of physical danger or psychological harm to the child exists.

"(b) The application shall be accompanied by an affidavit made under oath which includes a statement (1) of the conditions requiring an emergency ex parte order, (2) that an emergency ex parte order is in the best interests of the child, and (3) of the actions taken by the applicant or any other person to inform the respondent of the request or, if no such actions to inform the respondent were taken, the reasons why the court should consider such application on an ex parte basis absent such actions.

"(c) The court shall order a hearing on any application made pursuant to this section. If, prior to or after such hearing, the court finds that an immediate and present risk of physical danger or psychological harm to the child exists, the court may, in its discretion, issue an emergency order for the protection of the child and may inform the Department of Children and Families of relevant information in the affidavit for investigation purposes. The emergency order may provide temporary child custody or visitation rights and may enjoin the respondent from: (1) Removing the child from the state; (2) interfering with the applicant's custody of the child; (3) interfering with the child's educational program; or (4) taking any other specific action if the court determines that prohibiting such action is in the best interests of the child. If relief on the application is ordered ex parte, the court shall schedule a hearing not later than fourteen days after the date of such ex parte order. If a postponement of a hearing on the application is requested by either party and granted, no ex parte order shall be granted or continued except upon agreement of the parties or by order of the court for good cause shown. . . ."

[4] The application for an emergency ex parte order of custody alleged that N. R. had no stable place to live, was on parole, and was mentally and verbally abusive to M. P. and to the children. It further alleged that he had referred to M. P. with degrading and profane language and that he had screamed at her in front of the children.

court, in addition to awarding temporary custody of the children to M. P., ordered that N. R. "have supervised visitation with the minor children every Sunday from 3 p.m. to 5 p.m." The court also ordered that N. R. have phone contact and nightly FaceTime calls with the children.

On December 3, 2020, M. P. filed an application for an ex parte restraining order pursuant to General Statutes (Rev. to 2019) § 46b-15.[5] Specifically, M. P. first detailed a history of physical and verbal altercations with N. R. dating back to 2017, and then alleged that in the summer of 2020, N. R. had driven by her house on a regular basis and had parked outside on multiple occasions and that, in September, 2020, "after breaking up, our Google accounts were linked and he was searching for 'Waterbury's most gruesome murders.' " M. P. further alleged that, in November, 2020, while she was dropping the children off for their visit with N. R., "he smacked me, pushed me to [the] ground . . . and was screaming about how I do not respect him." The court, *Ficeto, J.*, granted the ex parte restraining order that same day and ordered, inter alia, that N. R. "not assault, threaten, abuse, harass, follow, interfere with, or stalk [M. P.]," and that he "[s]tay away from the home of [M. P.] and wherever [she] shall reside." The court also scheduled a hearing for December 15, 2020. Following the December 15, 2020 hearing, the court, *Coleman, J.*, granted the application for a restraining order and continued the ex parte orders. The restraining order had an expiration date of June 15, 2021.

---

[5] General Statutes (Rev. to 2019) § 46b-15 (a) provides in relevant part: "Any family or household member . . . who has been subjected to a continuous threat of present physical pain or physical injury, stalking or a pattern of threatening, including, but not limited to, a pattern of threatening, as described in section 53a-62, by another family or household member may make an application to the Superior Court for relief under this section. . . ."

In February, 2021, the court appointed The Children's Law Center of Connecticut, Inc. (Children's Law Center), as the guardian ad litem for the minor children.[6] On June 9, 2021, following a case date[7] with the parties, the court ordered that the "[p]arties shall share joint legal custody . . . ." On September 21, 2021, following another case date, the court issued a new order, which updated child support orders and provided that N. R. was to schedule a meeting with the guardian ad litem and "participate in the family program." On November 3, 2021, M. P. filed another application for an emergency ex parte order of custody,[8] seeking temporary custody and supervised visitation. On that same date, the court,

---

[6] Children's Law Center filed an appearance on February 16, 2021.

[7] "Case Dates are scheduled as interim hearing dates in new dissolution of marriage, legal separation, custody, and visitation cases, for the court to consider issues that should be addressed before a final trial date. A Case Date is a hearing before a judge to address matters like motions for temporary orders on custody, child support, or other subjects, to be in effect while [a] case is pending. The judge may also hear reports on the progress of services that have been ordered in [a] case and may schedule additional future court dates. . . . Case Dates are not for the final trial of [a] case. They are intended as checkpoints along the way to final resolution, to keep [a] case on track and to conduct brief hearings on issues that need orders in place before there is a final agreement or trial." State of Connecticut, Judicial Branch, The Pathways Process in Your Divorce, Custody or Visitation Case, What Are Case Dates, available at https://jud.ct.gov/family/pathwaysprocess.htm (last visited on August 16, 2024).

[8] The application alleged in relevant part: "This past Sunday, [October 31, 2021] at drop-off for his visit [with the children, N. R.] started to yell at me and told [the children] that I am 'nothing but a whore and all I do is smoke crack and suck d**k' in front of the girls. When I threatened to withhold his visit he threatened to break my jaw if I did that. This all happened in front of the [children]. He took [the children] and I contacted the Waterbury Police and reported the threat. When the [children] came home they started asking questions about what crack was and what sucking d**k means.

"The family therapist, Dasha Spells, was at my home on [November 1, 2021] and observed [the children's] behavior after the nightly phone call with [N. R.]. He never contacted the family program as [previously ordered] and the therapist is recommending the unsupervised contact cease until he engages with the children in a therapeutic environment. She believes that the children lack a connection to [N. R.] and wants to engage with him [about] proper parenting methods."

*Ficeto, J.*, granted the ex parte application, ordered that N. R. have no visitation with the children, and scheduled a hearing on its ex parte order for November 16, 2021. After the November 16, 2021 hearing, the court ordered that M. P. "shall have sole legal custody" of the children and that N. R. "shall have supervised visitation through the Family Stokes Program until further court order." The trial on M. P.'s custody application was scheduled for November 30, 2021. That day, M. P., her counsel, and the guardian ad litem appeared for the scheduled trial, but the trial did not proceed because N. R. was unavailable. The court ordered that the November 16, 2021 orders remain in full force and effect and that the trial be rescheduled. The trial was rescheduled to January 11. 2022.

On December 2, 2021, N. R. filed a motion for contempt, alleging that he had not been able to see or communicate with the children. No action was taken on this motion until December 16, 2021, when the court, *Ficeto, J.*, scheduled a contempt hearing also for January 11, 2022. Also on December 16, 2021, N. R. filed his own application for an emergency ex parte order of custody, requesting that "all parties . . . obey court orders to allow my court-ordered supervised visits [and] phone calls. Stokes Program [refuses] to do visits with me . . . ." That application was denied that same day and was scheduled to be heard on January 11, 2022, as well.[9] The court, however, did not hold the combined

---

[9] N. R. also alleged in his application: "I was to have [a] court-order[ed] visit [with] Dasha (Stokes Agency) and my children, but was arrested and [the] visit never happened. I called Dasha after [the] arrest and she told me she refuses to do court-ordered visit[s]. I filed a contempt and tried to go through another agency, but they cannot supervise the visit [without a] court order in their name. I also have not been able to communicate [with] my children over [the] phone due to [the] protective order against the mother of my children. [The] [l]ast contact I [had] is [a] phone call [the week of] Thanksgiving and [the] children [were] being mean and vengeful due to mother [and] grandmother's teachings. I have video evidence of proof of interactions of phone calls. I believe my children are in 'great danger' of psychological harm, due to parental [alienation]."

trial and hearing on January 11, 2022, and, instead, the matter was continued to January 25, 2022, at which the court heard testimony. Thereafter, the matter was continued to March 2, 2022. Also on January 25, 2022, the court, *Nieves, J.*, issued an order providing that the "[g]uardian ad litem is to look into a family therapeutic setting for [N. R.] to engage in weekly supervised visits with [the children] via Wellmore and/or Behavioral Health Consultants or equivalent. [N. R.] is to provide the court upon completion proof he attended anger management classes. Both parties [are] to engage in individual support counseling. Neither party shall discourage contact between the other party and the minor child[ren] or use vulgar language while in the presence of the minor child[ren]." Subsequently, on February 24, 2022, M. P. withdrew her application for custody prior to the completion of the trial on her application for custody and the hearing on N. R.'s motion and application.

On March 2, 2022, N. R. filed a custody application, commencing the underlying matter in the current appeal, seeking joint legal custody of the children and a parenting responsibility plan.[10] When M. P. was served with the custody application, she also was served with automatic orders, which provided in relevant part: "In all cases involving a child or children, whether or not the parties are married or in a civil union: (1) Neither party shall permanently remove the minor child or children from the state of Connecticut, without written consent of the other or order of a judicial authority." On March 31, 2022, the court again appointed Children's

---

[10] In his application, N. R. also checked the box to request visitation, underneath which he wrote: "Allowed to see my children." At subsequent hearings on his application, N. R. clarified that he was seeking joint legal custody of the minor children and a shared parenting plan in which he had regular overnight parenting time.

Law Center as the guardian ad litem and issued a list of duties for the guardian ad litem.[11]

On April 25, 2022, M. P. filed a cross complaint seeking sole legal custody, after which she moved to South Carolina with the children. On May 18, 2022, N. R. filed an application for an emergency ex parte order of custody seeking orders of temporary legal and physical custody of the children and that M. P. may not remove the children from the state of Connecticut or interfere with his custody of the children. In his application, N. R. wrote: "[M. P.] has taken [the children] out of state during custody battle. [The guardian ad litem] has not informed me where my children are. At times I've witnessed my children telling me that I will never find them and that they are moving far away from daddy. I've informed the [guardian ad litem] with no help. I've informed the court that [M. P.] was planning on moving and still nothing." The ex parte application was denied that same day by the court, *Ficeto*, *J.*, and a hearing date was set for June 28, 2022. Following the June 28 hearing, the court entered an order concerning, inter alia, visitation between N. R. and the children.[12]

---

[11] On the form for the list of duties for the guardian ad litem, the court checked the box next to "All duties listed in this section," which included the following: "[i]nvestigate facts necessary to make recommendations to the court regarding the . . . children's best interests"; "[c]ommunicate with parties"; "[c]ommunicate with the . . . children"; "[c]onduct home visits"; "[c]onfer with family services"; "[r]eview all files and records . . ."; "[c]onfer with teachers and other school authorities"; "[c]onfer with professionals"; "[p]articipate in the creation of a parenting plan"; "[r]eport to the court as requested or as deemed necessary"; and "[f]acilitate settlement of disputes."

[12] Specifically, the order provided: "[M. P.] currently resides in South Carolina with the minor children. [N. R.] resides in Connecticut. [M. P.] shall make every effort to arrange for an in person visitation of the minor children with [N. R.] by a third-party person within . . . six weeks from the date of this order. In addition, commencing next week, [N. R.] shall have phone call visits with the minor children by a third-party person on Monday, Wednesday and Fridays at 7 p.m. for a minimum of . . . five minutes with each phone call visit. [M. P.] is not to be involved in the phone call visits with [N. R.] and the minor children. . . . [N. R.] shall have at

On October 4, 2022, the court, *Parkinson, J.*, held a trial on N. R.'s custody application. During that trial, N. R., M. P., and the guardian ad litem all testified. On October 17, 2022, the court issued its memorandum of decision in which it made the following factual findings. "[N. R.] is forty-three years old and in good health. He is currently employed as [a] landscaper and has a flexible work schedule. . . . [M. P.] is thirty-two years old and in good health. She is currently employed . . . as a salesperson in South Carolina. The minor children are five years old and currently enrolled in kindergarten in South Carolina. . . .

"[T]here were allegations of domestic violence and stalking by [N. R.] against [M. P.]. In one such incident [N. R.] did say, in front of his children, that [M. P.], their mother, was a 'whore,' and used other profanities to describe [M. P.] and her personal activities. The minor children were four . . . years old at the time of this incident. As a result of the alleged domestic violence and verbal altercations between the parties, criminal charges were filed against [N. R.] and orders of

least . . . one in person visit with the guardian ad litem and the Behavior Health Center both involving [N. R.] with the minor children within [six] weeks from the date of this order."

On August 29, 2022, the court entered a subsequent order, which provides: "[N. R.] shall provide an updated financial affidavit to the court, forthwith. Upon completion of anger management classes, [N. R.] shall provide to the court a copy of the certification of completion. [M. P.] shall provide both to the court and to the [guardian ad litem] a copy of the itinerary of travel [arrangements] showing costs to travel from South Carolina to Connecticut. In addition, [M. P.] shall provide a letter from [her] employer with regard to employment status of the probationary period and work schedule to both the court and the [guardian ad litem]. Based on the child support guidelines, the presumptive weekly amount of child support payable by [N. R.] is $0. [N. R.] has not filed an updated financial affidavit to date and states he is unemployed at this time. [N. R.] reports to the court he is making money performing side jobs such as landscaping. The court finds under all the facts and circumstances of the case that the strict application of the child support guidelines would be inappropriate and order[s] [N. R.] to pay to [M. P.] weekly child support payments in the amount of $154 for the two . . . minor children."

protection issued where [M. P.] was the protected party. As a result of the protective order(s) and filings in this and [the prior custody action initiated by M. P.], [N. R.] was permitted to have weekly Sunday supervised visits. [M. P.] called the Department of Children and Families [department] . . . after one of the minor children reported to her that [N. R.] bit the minor child during one of his visits with the minor children. [The department] investigated and concluded that the allegation was 'unfounded.'

"In April, 2022, after the initiation of the instant matter, [M. P.] moved to South Carolina with the minor children. [M. P.'s] mother, with whom she had been residing, sold her home in Connecticut and moved to South Carolina. [M. P.] could not afford to find accommodations for herself and the minor children and thus moved with her mother to South Carolina, where she and the children currently reside.

"[N. R.] currently resides in Waterbury alone in a studio apartment.

"[M. P.] testified that she is working full-time on a rotating schedule but her mother, with whom she and the minor children reside, supports and helps care for the children whilst [M. P.] is at work. [N. R.] believes that the minor children should never have been moved to South Carolina and that as a result he should not have to travel to South Carolina to see them. Instead, he insists, they should come to live with him for six months every year.

"[N. R.] has not seen the minor children since February, 2022. Behavior Health Consulting, Inc., hosted supervised visitation between [N. R.] and the minor children in Connecticut between May, 2021, and February, 2022. The supervised visits were largely a success, and the interactions between [N. R.] and the minor children were found to be appropriate. The court

believes that the visits would have been switched to unsupervised visitation should the minor children have remained in Connecticut. Nevertheless, the children did move to South Carolina and video chats/phone calls ensued. [N. R.] complains that [M.P.] interferes with these calls with the minor children and that, at times, there are other men around his daughters, which is distracting and interfering with his phone calls.

"[N. R.] testified at length that he has been wronged by the legal system. Specifically, he feels that because he is not the mother but, instead, the father, he is being treated differently. He shared that he believes that if he had taken the children out of state without a court order that there would have been Amber Alerts and he would be incarcerated as a result. He is upset that he was forced to have supervised visits with his children, yet he takes no ownership for any of his own possible wrongdoings. The court is concerned that [N. R.'s] foul language and angry outbursts[13] are the cause of his strained relationship with [M. P.] and, by extension, his minor children. The court notes that [N. R.] recently underwent a course on anger management in relation to a criminal order for him to undergo such training. The court believes he would benefit from both individual therapy and the parenting education course as well.

"[N. R.] testified that [M. P.] has no support in South Carolina, has random men around his children, and has guns. The court does not find [his] testimony in this regard particularly compelling due to [M. P.'s] credible testimony to the contrary. Specifically, [M. P.] testified that [N. R.] began stalking her while she was in Connecticut, and she was informed that he was looking at or inquiring about serial killers in Waterbury. This made [M. P.] understandably afraid and she began taking steps toward gun ownership. She does not currently possess

---

[13] "Some angry outbursts were displayed during the hearing."

any firearms despite this. Further, [M. P.] testified that her mother is her support system, and even [N. R.] admitted that the grandmother facilitates the evening phone calls between him and the minor children. . . .

"[N. R.] is seeking an order of joint legal custody. [M. P.] objects to this and seeks an order of sole legal custody. The court accepts the parties' uncontroverted testimony that they have had a tumultuous, volatile, and at times violent relationship. The court is disturbed by the vulgar language [N. R.] used in front of the minor children to describe [M. P.], for which he appeared unapologetic. The court is also concerned that the children have not seen [N. R.] in person since February, 2022, and have not spent an overnight with him since the couple split in 2020. [N. R.] has thus never had the children overnight without the presence of [M. P.] The court also notes that [N. R.] has a studio apartment that could temporarily accommodate an overnight visit but notes [N. R.] has no immediate family or support system in the area. . . .

"[N. R.] admits that he has not complied with [the August 29, 2022] order that he pay weekly child support to [M. P.]. He went further to testify that he should not be paying to see his children in South Carolina. What [N. R.] is overlooking is that his own disappointment in the situation is not what is of the utmost importance to the court. Instead, the court is guided by what is in the best interests of the minor children. [M. P.] has been the caregiver of the children their entire [lives] consistently. The stability of the home provided with [M. P.] has never been credibly called into question. [N. R.] on the other hand has shown that his anger and hurt can, and does at times, direct his actions toward [M. P.], which in turn affects his relationship with his children. The court is convinced that, at the present time, the best interests of the children will be served by [M. P.] having sole legal and physical custody of the

children with generous visitation rights given to [N. R.]." (Citations omitted; footnote in original; footnote omitted.)

After the court made these factual findings, it stated that it had "carefully considered all of the factors listed in General Statutes § 46b-56" and issued its ruling. The court ordered that M. P. "shall have sole legal and physical custody of the minor children" and that their primary residence would be in South Carolina; however, both parents would "have unrestricted access to the children's providers and the children's records." With respect to parenting time, the court ordered that there shall be video calls between N. R. and the children on Mondays, Wednesdays, and Fridays after school but before bedtime. The court also issued orders regarding visitation in both South Carolina and Connecticut. Specifically, the court ordered that M. P. shall bring the children to Connecticut to see N. R. at least twice per year, with visits lasting at least four days each. The court provided the following instructions relevant to visitation in Connecticut: "[M. P.] shall inform [N. R.] of the travel dates at least forty-five . . . days in advance and shall provide him with the itinerary itemizing the costs for the trip. . . . If [N. R.] is up to date in child support payments, then the parents shall equally share the costs for the children's travel. . . . [N. R.] shall provide [M. P.] with payment for his portion of the children's expenses at least twenty-one . . . days prior to the scheduled trip, so that [M. P.] may purchase tickets and make appropriate reservations. . . . If funds are not provided at least twenty-one . . . days prior to the scheduled trip, then the trip may be cancelled by [M. P.] without penalty in court. . . . When the children are in Connecticut, they shall enjoy time with [N. R.] each day from 10 a.m. until 6 p.m. . . . The transitions shall take place at the Waterbury Police Department."

The court provided the following instructions relevant to visitation in South Carolina. "[N. R.] may enjoy parenting time with the children in South Carolina as [often as] he is able to make the trip, but no more than once per month. . . . [N. R.] shall inform [M. P.] (or her designee if the protective order is still in place) of the dates and times of his travel to see the children in South Carolina at least thirty . . . days in advance. . . . When [N. R.] is in South Carolina, he may see the children daily from 10 a.m. until 6 p.m. if they are not in school, or from after school until 6 p.m. if they are in school, not to exceed five consecutive days."

Finally, the court ordered that both N. R. and M. P. engage in individual therapy, that the minor children engage in therapy, and that both parents complete the required parenting education program as prescribed by General Statutes § 46b-69b within six months from the date of the order, refrain from threatening, harassing, or stalking each other, and "encourage and foster the maximum relations of love, affection, and respect between the children and the other parent." This appeal followed. Additional facts shall be set forth as necessary.

We first set forth our well established standard of review applicable to child custody and family matters. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is

evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Our deferential standard of review, however, does not extend to the court's interpretation of and application of the law to the facts. It is axiomatic that a matter of law is entitled to plenary review on appeal." (Internal quotation marks omitted.) *Coleman* v. *Bembridge*, 207 Conn. App. 28, 33–34, 263 A.3d 403 (2021). "As has often been explained, the foundation for [our deferential] standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . ." (Internal quotation marks omitted.) *F. S.* v. *J. S.*, 223 Conn. App. 763, 785, 310 A.3d 961 (2024).

I

N. R.'s first claim on appeal is that the court improperly awarded sole legal and physical custody of the minor children to M. P. Specifically, N. R. argues that the court should have taken into account M. P.'s relocation to South Carolina, in violation of the automatic orders, and included a relocation analysis in making its best interests determination as to custody.[14] We disagree.

We first set forth the legal principles regarding a trial court's custody determination. "Orders regarding the

---

[14] N. R. also argues, in support of this claim, that M. P. should not have been allowed to withdraw her previous custody application. We note, however, that N. R. appealed only from the judgment of the court awarding M. P. sole legal and physical custody, not from the withdrawal of the previous action. Furthermore, in response to N. R.'s application for custody, M. P. filed a cross complaint seeking sole legal custody, which effectively negated her prior withdrawal. Moreover, to the extent that N. R. is attempting to assert a separate claim that the court erred in awarding M. P. sole legal and physical custody because she improperly was permitted to withdraw her previous action, we conclude that the claim is "superficial and conclusory" and is inadequately briefed. See *Burton* v. *Dept. of Environmental Protection*, 337 Conn. 781, 793 n.9, 256 A.3d 655 (2021). We, therefore, decline to review it.

custody and care of minor children . . . are governed by . . . § 46b-56, which grants the court broad discretion in crafting such orders." Id., 785–86. "[Section] 46b-56 (a) provides in relevant part: 'In any controversy before the Superior Court as to the custody or care of minor children . . . the court may make . . . any proper order regarding the custody, care, education, visitation and support of the children if it has jurisdiction . . . . Subject to the provisions of section 46b-56a, the court may assign parental responsibility for raising the child to the parents jointly, or may award custody to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. . . . (b) In making . . . any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests. Such orders may include . . . (3) the award of sole custody to one parent with appropriate parenting time for the noncustodial parent where sole custody is in the best interests of the child . . . .' " *Collins* v. *Collins*, 117 Conn. App. 380, 395, 979 A.2d 543 (2009). "[Section] 46b-56 (c) directs the court, when making any order regarding the custody, care, education, visitation and support of children, to consider the best interests of the child, and in doing so [the court] may consider, but shall not be limited to, one or more of [seventeen enumerated] factors[15]. . . . The court is not required to

---

[15] In determining the best interests of the child, the court looks to the factors enumerated in § 46b-56 (c): "(1) The physical and emotional safety of the child; (2) the temperament and developmental needs of the child; (3) the capacity and the disposition of the parents to understand and meet the needs of the child; (4) any relevant and material information obtained from the child, including the informed preferences of the child; (5) the wishes of the child's parents as to custody; (6) the past and current interaction and relationship of the child with each parent, the child's siblings and any other

assign any weight to any of the factors that it considers.''
(Footnote added; internal quotation marks omitted.)
*Anketell* v. *Kulldorff*, 207 Conn. App. 807, 847, 263 A.3d
972, cert. denied, 340 Conn. 905, 263 A.3d 821 (2021).

"In reaching a decision as to what is in the best
interests of a child, the court is vested with broad discre-
tion and its ruling will be reversed only upon a showing
that some legal principle or right has been violated or
that the discretion has been abused. . . . As our
Supreme Court recently reiterated, [t]he authority to
exercise the judicial discretion [authorized by § 46b-56]
. . . is not conferred [on] [the state's appellate courts],
but [on] the trial court, and . . . we are not privileged
to usurp that authority or to substitute ourselves for
the trial court. . . . A mere difference of opinion or
judgment cannot justify our intervention. Nothing short
of a conviction that the action of the trial court is one

person who may significantly affect the best interests of the child; (7)
the willingness and ability of each parent to facilitate and encourage such
continuing parent-child relationship between the child and the other parent
as is appropriate, including compliance with any court orders; (8) any manip-
ulation by or coercive behavior of the parents in an effort to involve the
child in the parents' dispute; (9) the ability of each parent to be actively
involved in the life of the child; (10) the child's adjustment to his or her
home, school and community environments; (11) the length of time that the
child has lived in a stable and satisfactory environment and the desirability
of maintaining continuity in such environment, provided the court may
consider favorably a parent who voluntarily leaves the child's family home
pendente lite in order to alleviate stress in the household; (12) the stability
of the child's existing or proposed residences, or both; (13) the mental and
physical health of all individuals involved, except that a disability of a
proposed custodial parent or other party, in and of itself, shall not be
determinative of custody unless the proposed custodial arrangement is not
in the best interests of the child; (14) the child's cultural background; (15)
the effect on the child of the actions of an abuser, if any domestic violence,
as defined in section 46b-1, has occurred between the parents or between
a parent and another individual or the child; (16) whether the child or a
sibling of the child has been abused or neglected, as defined respectively
in section 46b-120; and (17) whether the party satisfactorily completed
participation in a parenting education program established pursuant to sec-
tion 46b-69b.'' General Statutes § 46b-56 (c).

[that] discloses a clear abuse of discretion can warrant our interference. . . .  *Zhou* v. *Zhang*, 334 Conn. 601, 632–33, 223 A.3d 775 (2020); see also *Yontef* v. *Yontef*, 185 Conn. 275, 279, 440 A.2d 899 (1981) ([i]t is a rare case in which a disappointed litigant will be able to demonstrate abuse of a trial court's broad discretion in [child custody] matters)." (Citation omitted; internal quotation marks omitted.) *F. S.* v. *J. S.*, supra, 223 Conn. App. 786–88.

The primary basis of N. R.'s claim on appeal is that the court, in considering the best interests of the children in making its custody determination, erred in failing to consider the test set forth in General Statutes § 46b-56d, which relates to a parent's postjudgment relocation with a child.[16] N. R. acknowledges that § 46b-56d applies to postjudgment relocation matters but argues, nonetheless, that the test set forth in § 46b-56d "should be considered in determining the children's best interests in the context of establishing custody orders." Thus, according to N. R., the court "abused its discretion in this case by not considering at all the impact relocation would have on N. R. as a father . . . [and] the benefit

[16] General Statutes § 46b-56d provides: "(a) In any proceeding before the Superior Court arising *after the entry of a judgment awarding custody of a minor child* and involving the relocation of either parent with the child, where such relocation would have a significant impact on an existing parenting plan, the relocating parent shall bear the burden of proving, by a preponderance of the evidence, that (1) the relocation is for a legitimate purpose, (2) the proposed location is reasonable in light of such purpose, and (3) the relocation is in the best interests of the child.

"(b) In determining whether to approve the relocation of the child under subsection (a) of this section, the court shall consider, but such consideration shall not be limited to: (1) Each parent's reasons for seeking or opposing the relocation; (2) the quality of the relationships between the child and each parent; (3) the impact of the relocation on the quantity and the quality of the child's future contact with the nonrelocating parent; (4) the degree to which the relocating parent's and the child's life may be enhanced economically, emotionally and educationally by the relocation; and (5) the feasibility of preserving the relationship between the nonrelocating parent and the child through suitable visitation arrangements." (Emphasis added.)

N. R. would add for the children's lives by being present every week [with] them." We do not agree that the test set forth in § 46b-56d is applicable to the present case. Furthermore, N. R.'s claim that the court did not consider M. P.'s relocation with the children to South Carolina when conducting its best interest analysis is without merit.

We now set forth the case law relevant to N. R.'s claim relating to M. P.'s relocation with the children. In *Ireland* v. *Ireland*, 246 Conn. 413, 414–15, 717 A.2d 676 (1998), our Supreme Court addressed the issue of a *custodial parent* seeking permission to relocate out of state with a minor child. In its decision, our Supreme Court held "that a custodial parent seeking permission to relocate bears the initial burden of demonstrating, by a preponderance of the evidence, that (1) the relocation is for a legitimate purpose, and (2) the proposed location is reasonable in light of that purpose. Once the custodial parent has made such a prima facie showing, the burden shifts to the noncustodial parent to prove, by a preponderance of the evidence, that the relocation would not be in the best interests of the child." Id., 428. The court also set forth factors that must be considered in determining the best interests of the child in future relocation cases. Id., 431–32.[17] Our

---

[17] Those factors include: "[E]ach parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements. . . . [Also relevant is] . . . the negative impact, if any, from continued or exacerbated hostility between the custodial and noncustodial parents, and the effect that the move may have on any extended family relationships." (Citation omitted; internal quotation marks omitted.) *Ireland* v. *Ireland*, supra, 246 Conn. 431–32; see also *Brennan* v. *Brennan*, 85 Conn. App. 172, 180–81, 857 A.2d 927, cert. denied, 271 Conn. 944, 861 A.2d 1177 (2004).

legislature adopted the factors set forth by our Supreme Court in *Ireland* and enacted No. 06-168 of the 2006 Public Acts, codified at § 46b-56d, which is limited to "any proceeding before the Superior Court arising *after the entry of a judgment awarding custody of a minor child* . . . ." (Emphasis added.) General Statutes § 46b-56d; see also *Taylor* v. *Taylor*, 119 Conn. App. 817, 821–22, 990 A.2d 882 (2010). In the present case, by contrast, M. P.'s relocation with the children occurred before the court rendered judgment awarding her custody.

In *Ford* v. *Ford*, 68 Conn. App. 173, 176, 789 A.2d 1104, cert. denied, 260 Conn. 910, 796 A.2d 556 (2002), this court addressed the question of "whether *Ireland* applies to relocation issues that arise when the initial custody determination is made . . . ." In concluding that *Ireland* does not extend to such situations, we held "that *Ireland* is limited to postjudgment relocation cases. We conclude[d] that because the *Ireland* court did not expand its holding to affect all relocation matters, relocation issues that arise at the initial judgment for the dissolution of marriage continue to be governed by the standard of the best interest of the child as set forth in § 46b-56. While the *Ireland* factors *may be considered* as 'best interest factors' and give guidance to the trial court, *they are not mandatory or exclusive in the judgment context.*" (Emphasis added.) Id., 184. Accordingly, pursuant to *Ford*, it is within a trial court's discretion whether to consider the *Ireland* factors, now set forth in § 46b-56d, in making its determination of the best interests of a child for purposes of a custody decision made after a parent already has relocated with a child. See also *O'Neill* v. *O'Neill*, 209 Conn. App. 165, 183, 268 A.3d 79 (2021) ("By its plain language, § 46b-56d applies when the relocation issue arises after the entry of a judgment awarding custody of a minor child. Accordingly, § 46b-56d does not apply in the present

case because the relocation issue was decided in the initial judgment dissolving the parties' marriage at the same time that the court was establishing the parenting plan. See, e.g., *Lederle* v. *Spivey*, 113 Conn. App. 177, 187 n.11, 965 A.2d 621 ([t]he enactment of . . . § 46b-56d clearly changed the analysis and the burden allocation in *postjudgment* relocation cases, but there is no indication that the legislature intended it to apply to relocation matters resolved at the time of the initial judgment for the dissolution of a marriage . . . ), cert. denied, 291 Conn. 916, 970 A.2d 728 (2009). Indeed, this court has held that relocation issues that arise at the initial judgment for the dissolution of marriage continue to be governed by the standard of the best interest of the child as set forth in . . . § 46b-56. Id., 187." (Emphasis in original; footnote omitted; internal quotation marks omitted.)).

In the present case, the court noted that it was guided by § 46b-56 (a) and (c) in making its determination regarding custody, and that its focus must be "the best interests of the minor children." The court made specific findings relating to the parties, the nature of their relationship and their behaviors with each other and in front of the children, including "that they have had a tumultuous, volatile, and at times violent relationship." N. R. has not challenged those findings on appeal.

Furthermore, the present case does not involve a postjudgment relocation; N. R. filed an application seeking joint legal custody with a shared parenting plan, and M. P. filed a cross complaint seeking sole legal custody. Before a custody determination was made and a trial was held on the matter, M. P. relocated to South Carolina. Pursuant to *Ford* and § 46b-56d, the court was not required to perform the relocation analysis set forth in the statute. Instead, the court was required to determine whether granting joint custody to N. R. and M. P., or sole custody to M. P., was in the best interests

of the children in accordance with § 46b-56. The court concluded, on the basis of its factual findings which are not challenged on appeal, that it was in the best interests of the children for M. P. to have sole legal and physical custody.

In addition, although the court did not apply the test set forth in § 46b-56d, it is clear that the court considered the impact of the children's relocation in its best interests analysis. The court found that M. P. relocated with the children to South Carolina because her mother, with whom M. P. and the children lived in Connecticut, sold her home and moved to South Carolina. The court found that M. P. "could not afford to find accommodations for herself and the minor children and thus moved with her mother to South Carolina where she and the children currently reside." In rejecting N. R.'s assertion that M. P. has no support in South Carolina, the court noted M. P.'s testimony that "her mother is her support system" and that N. R. admitted that M. P.'s mother "facilitates the evening phone calls between him and the minor children." With respect to N. R.'s complaint that he should not have to pay to see his children in South Carolina, the court specifically stated that, what N. R. "is overlooking is that his own disappointment in the situation is not what is of the utmost importance to the court. Instead, the court is guided by what is in the best interests of the minor children. [M. P.] has been the caregiver of their children for their entire life consistently. The stability of the home provided with [M. P.] has never been credibly called into question. [N. R.], on the other hand, has shown that his anger and hurt can, and does at times, direct his actions toward [M. P.], which in turn affects his relationship with his children. The court is convinced that at the present time, the best interests of the children will be served by [M. P.] having sole legal and physical custody of the children with generous visitation rights given to [N.

R.].”[18] The court then crafted a detailed parenting plan that gives N. R. significant unsupervised in person visitation in both South Carolina and Connecticut. Thus, the court's findings and orders show that the court considered the impact of M. P.'s relocation to South Carolina

[18] We note that N. R.'s argument—that the court failed to consider M. P.'s relocation in violation of the automatic orders in analyzing what would be in the best interests of the children—does not challenge any of the factual findings underlying the court's best interest analysis. Whether M. P. should have been sanctioned for violating the automatic orders is a separate question from what was in the best interests of the children. The court was tasked with resolving the latter issue. N. R. never filed a motion for contempt seeking sanctions against M. P. for violating the automatic orders. See footnote 19 of this opinion. The court having concluded that it is in the best interests of the children that they live with M. P. in South Carolina, ordering their return to Connecticut because M. P. violated the automatic orders would effectively sanction the children for the violation. We see no basis in our law for such a result.

Furthermore, to the extent that N. R. challenges the court's conclusion that sole custody in one of the parents was in the best interests of the children in the present case, we note that our courts have consistently recognized ongoing acrimony and conflict between parents, which was well established in the present case, as a basis for awarding one party sole custody. See, e.g., *Daddio* v. *O'Bara*, 97 Conn. App. 286, 297, 904 A.2d 259 ("ample evidence before the court pertaining to the parties' inability to cooperate and communicate with respect to the decisions regarding the minor child . . . supported the court's conclusion that joint legal custody, which requires a level of cooperation between parents, was not in the child's best interest"), cert. denied, 280 Conn. 932, 909 A.2d 957 (2006); see also *Lugo* v. *Lugo*, 176 Conn. App. 149, 153, 168 A.3d 592 (2017) (in affirming trial court decision to award sole custody, this court noted that trial court had found "it was abundantly clear that the parties were unable to coparent" (internal quotation marks omitted)); *Ge* v. *Liu*, Superior Court, judicial district of New Britain, Docket No. FA-20-5027193-S (October 23, 2023) (award of sole custody was appropriate given "that the parents have an inability to cooperate and communicate with respect to the decisions regarding the minor child, and . . . that requiring a level of cooperation between the parents would not be in the child's best interest"); *Adams* v. *Adams*, Superior Court, judicial district of Tolland, Docket No. FA-15-6009117-S (September 7, 2018) (award of sole custody to mother was due to "unhealthy and acrimonious" communication between parents, which was "severely damag[ing]" to children); *Mondello* v. *Mondello*, Superior Court, judicial district of New London, Docket No. FA-97-0542932-S (March 10, 2009) (joint custody was no longer appropriate due to "friction between the parents [that] led to at least three referrals to the Department of Children and Families"). The well-documented and persistent conflict between N. R. and M. P., therefore, supported the court's conclusion that joint legal custody would not be in the children's best interests.

when it constructed a custody and visitation order that it believed was in the best interests of the children. On the basis of this record and allowing "every reasonable presumption in favor of the correctness of its action"; (internal quotation marks omitted) *Pencheva-Hasse* v. *Hasse*, 221 Conn. App. 113, 122, 300 A.3d 1175 (2023); we cannot conclude that the court abused its wide discretion in making its custody determination and, in doing so, not applying the statutory test of § 46b-56d.

Finally, to the extent that N. R., in claiming that the court improperly failed to apply the test set forth in § 46b-56d, is essentially asserting that the court applied an improper legal standard in making its custody determination, that issue involves a question of law over which we exercise plenary review. See *Ford* v. *Ford*, supra, 68 Conn. App. 176–77; see also *Nationwide Mutual Ins. Co.* v. *Pasiak*, 346 Conn. 216, 227, 288 A.3d 615 (2023) (analysis of whether trial court applied correct legal standard involves question of law subject to plenary review); *Crews* v. *Crews*, 295 Conn. 153, 164, 989 A.2d 1060 (2010) (even in family matters, "the abuse of discretion standard applies only to decisions based solely on factual determinations made by the trial court"); *Princess Q. H.* v. *Robert H.*, 150 Conn. App. 105, 112, 89 A.3d 896 (2014) (plenary review, not abuse of discretion, is correct standard for question of law in family matter).

Our resolution of this issue requires little discussion. As we stated previously, relocation issues that arise before a judgment is rendered awarding custody and before a court establishes a parenting plan "continue to be governed by the standard of the best interest of the child as set forth in . . . § 46b-56." (Internal quotation marks omitted.) *O'Neill* v. *O'Neill*, supra, 209 Conn. App. 183. It is not disputed that the court applied that standard in making its custody determination in the present case. The court was not required to apply the

test set forth in § 46b-56d, which applies to postjudgment relocation matters, and, thus, its failure to do so does not provide a legal basis for challenging its custody determination. See *Ford* v. *Ford*, supra, 68 Conn. App. 184 (factors in *Ireland*, now codified at § 46b-56d, are limited to postjudgment relocation cases). Because the court's failure to apply that test was not improper and the court appropriately made its custody orders pursuant to the best interests of the children standard set forth in § 46b-56, N. R.'s claim is unavailing.[19]

## II

N. R.'s next claim is that the court improperly issued orders that require N. R. to be current with his child

[19] N. R. also asserts in his appellate brief that his "primary problem throughout the litigation in this case was that [M. P.] would blatantly violate court orders and there would be no consequences to [M. P.] . . . ." N. R. concedes, however, that he did not file a motion for contempt regarding the plaintiff's relocation to South Carolina, which is the proper vehicle to challenge a violation of the automatic orders. Practice Book § 25-5 (d) provides in relevant part: "The automatic orders of a judicial authority . . . shall be set forth immediately following the party's requested relief . . . in any application for custody or visitation, and shall set forth the following language in bold letters: **Failure to obey these orders may be punishable by contempt of court**. . . ."  (Emphasis in original.); see also *Belluci* v. *Dunn*, Superior Court, judicial district of New Haven, Docket No. CV-21-6117238-S (October 30, 2023) ("[i]f, hypothetically, the defendant violated the pendente lite orders, the appropriate approach would be to notify the court issuing the orders of the alleged violation and seek an enforcement of such orders"). After N. R. learned that M. P. had moved to South Carolina, he could have filed a motion for contempt, but he chose not to do so, and, therefore, he cannot now complain that the court never imposed any consequences on M. P.

To the extent that N. R., who was self-represented in the underlying action but is represented by counsel in this appeal, is arguing that, as a self-represented litigant, he should have been granted leeway in not following the proper procedure and filing a motion for contempt, we note that he filed multiple motions for contempt while self-represented in the previous custody action initiated by M. P. Therefore, any argument that he lacked the knowledge or ability to do so is unpersuasive. Moreover, this court consistently has held that, "[a]lthough we allow [self-represented] litigants some latitude, the right of self-representation provides no attendant license not to comply with relevant rules of procedural and substantive law." (Internal quotation marks omitted.) *Deutsche Bank National Trust Co.* v. *Pollard*,

support obligation and to pay one half of the travel expenses in order to receive parenting time with the children in Connecticut. We reject this claim and conclude that it is an inaccurate recitation of the substance of the court's parenting time orders.

"As we previously set forth in this opinion, [o]ur deferential standard of review [in domestic relations cases] . . . does not extend to the court's interpretation of and application of the law to the facts. It is axiomatic that a matter of law is entitled to plenary review on appeal. . . . Moreover, [t]he construction of [an order or] judgment is a question of law for the court . . . [and] our review . . . is plenary. As a general rule, [orders and] judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the [order or] judgment." (Internal quotation marks omitted.) *Coleman* v. *Bembridge*, supra, 207 Conn. App. 34–35. Furthermore, "[e]ffect must be given to that which is clearly implied as well as that which is expressed. . . . [W]e are mindful that an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding." (Internal quotation marks omitted.) *In re November H.*, 202 Conn. App. 106, 118, 243 A.3d 839 (2020). In the present case, because N. R.'s claim requires us to construe the visitation order, our review is plenary.

The court's parenting time order in its memorandum of decision provides for a parenting schedule in which M. P. is required to bring the children to Connecticut at least twice per year. She is required to inform N. R. of the dates for travel at least forty-five days in advance

---

182 Conn. App. 483, 488, 189 A.3d 1232 (2018). We cannot afford N. R. relief on appeal, however, given his failure to properly pursue the issue in the trial court by filing a motion for contempt.

and to provide him with an itinerary itemizing the costs of the trip. The order specifically provides that, "[i]f [N. R.] is up to date [on] child support payments, then the parents shall equally share the costs for the children's travel." Further, if N. R. fails to pay for his portion of the children's expenses for travel at least twenty-one days prior to a scheduled trip, the trip may be cancelled by M. P.

We note that N. R. is correct that the right to visitation cannot be conditioned on whether a party is current with his or her child support obligation. See *Raymond* v. *Raymond*, 165 Conn. 735, 742, 345 A.2d 48 (1974) ("It has never been our law that support payments were conditioned on the ability to exercise rights of visitation or vice versa. The duty to support is wholly independent of the right of visitation." (Footnote omitted.)); see also *D'Amato* v. *Hart-D'Amato*, 169 Conn. App. 669, 685 n.12, 152 A.3d 546 (2016).

In the present case, the court did not require N. R. to be current on child support to receive parenting time in Connecticut; rather, the order provides that "[*i*]*f* [N. R.] is up to date in child support payments, *then* the parents shall equally share the costs for the children's travel." (Emphasis added.) Although N. R. argues that the order allows the trip to be cancelled if he is not current on child support, the order does not condition N. R.'s visitation on whether he is current on child support. Instead, we construe the order as providing that, if N. R. is not current on child support, then he will bear the entire cost of the children's travel to Connecticut. If he is current on child support, he and M. P. will share the costs equally. The only circumstance in which M. P. is allowed to cancel a visit is if N. R. has not provided her with payment for his portion of the travel expenses, whether that payment is one half of the shared expenses or the entire portion, by twenty-one days before the visitation date. The order does not

allow the cancellation of a visit because N. R. is not current on child support payments. Accordingly, N. R.'s claim necessarily fails.[20]

### III

N. R.'s final claim is that the court improperly relied on the testimony of the guardian ad litem in conducting its assessment of the best interests of the children. Specifically, N. R. argues that M. P. prevented the guardian ad litem from observing him interact with the children and that, therefore, the guardian ad litem was "never in a position to give recommendations on custody . . . ." The guardian ad litem in the present case argues that a guardian ad litem "is not required to perform all conceivable actions to make a credible recommendation, nor should [it] be," and that the recommendations of the guardian ad litem are just one factor for the court to consider in issuing its orders. We agree with the guardian ad litem.

The following additional facts are relevant to our resolution of this claim. In appointing Children's Law Center as the guardian ad litem for the children, the

---

[20] N. R. also argues that it was an abuse of the court's discretion to order N. R. to pay one half of the travel expenses for parenting time in Connecticut when it was M. P. who removed the children to South Carolina in violation of the automatic orders. N. R. cites no authority to support his argument that it is an abuse of a court's discretion to order a parent to pay part of the travel expenses for parenting time. Moreover, "[i]n determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Smith* v. *Smith*, 249 Conn. 265, 282–83, 752 A.2d 1023 (1999); see id., 283–84 (not only is "the matter of travel expenses incurred in order to see one's children . . . listed explicitly as a factor for a trial court properly to consider when awarding child support" but "it can also be a consideration in determining alimony"). Given the wide discretion afforded to courts relating to child support, parenting time, and other custodial considerations, and that travel expenses are a proper consideration in an award of child support, N. R. has failed to demonstrate that the order requiring him to share in the travel costs related to his parenting time with the children in Connecticut was an abuse of the court's discretion.

court ordered[21] that its duties included the following: investigate facts necessary to make recommendations to the court regarding the children's best interests, communicate with the parties and the children, conduct home visits, confer with family services, review all files and records, confer with school authorities and relevant professionals, participate in the creation of a parenting plan, report to the court as requested, and facilitate settlement of disputes. Consistent with those duties, the guardian ad litem reviewed reports from a third-party supervisor about N. R.'s visitation with the children, conducted a home visit with N. R., made recommendations regarding visitation and custody to the court, attempted to facilitate disputes between N. R. and M. P., and attempted to observe N. R. interacting with the children but was unable to do so. The guardian ad litem testified,[22] and N. R. did not dispute, that on two occasions the guardian ad litem had scheduled a visit to observe N. R. and the children. The first visit was cancelled due to an ex parte order that was issued, which ordered that visitation between N. R. and the children cease at that time. Once visitation was subsequently restored, the guardian ad litem scheduled another visit to observe N. R. with the children at the library, but N. R. was arrested before the visit and the visit did not take place.

We begin with the legal principles relevant to the role of a guardian ad litem. "As a general rule, the role of

---

[21] The duties, as ordered by the court, are set forth on form 227, a Judicial Branch form, and the court's order was issued pursuant to General Statutes § 46b-12 (c), which provides in relevant part that, "[n]ot later than twenty-one days following the date on which the court enters an initial order appointing counsel or a guardian ad litem for any minor child pursuant to this section, the court shall enter a subsequent order that includes the following information: (1) The specific nature of the work that is to be undertaken by such counsel or guardian ad litem . . . ."

[22] Attorney Randa Hojaiban appeared and testified at the hearing on behalf of Children's Law Center.

a guardian ad litem is to represent the best interest of the child." *In re William H.*, 88 Conn. App. 511, 520, 870 A.2d 1102 (2005); see also *V. V.* v. *V. V.*, 218 Conn. App. 157, 169, 291 A.3d 109 (2023) ("[i]t is well established that the role of the guardian ad litem is to speak on behalf of the best interest of the child" (internal quotation marks omitted)). "Although the term best interest is elusive to precise definition, one commission study aptly observed that [t]he best interests of the child has been generally defined as a measure of a child's well-being, which includes [the child's] physical (and material) needs, [the child's] emotional (and psychological) needs, [and the child's] intellectual and . . . moral needs. . . .

"Further illumination of the role of the guardian ad litem can be found in a publication of the American Academy of Matrimonial Lawyers (Academy) regarding standards for the representation of children in family proceedings. Although those standards focus primarily on the role of counsel for a minor child, in its discussion of guardians ad litem, the Academy espouses the view that the primary task for the guardian ad litem, at trial, is to make the decision maker aware of all the facts and to offer evidence as a sworn witness, subject to cross-examination. Those standards also recommend that the guardian ad litem engage in frequent communication with the child, and generally help to expedite the process and to encourage settlement of disputes. American Academy of Matrimonial Lawyers, Representing Children (1995) p. 4." (Citation omitted; footnotes omitted; internal quotation marks omitted.) *In re Tayquon H.*, 76 Conn. App. 693, 704–706, 821 A.2d 796 (2003).

Our Supreme Court "has consistently held in matters involving child custody . . . that while the rights, wishes and desires of the parents must be considered it is nevertheless the ultimate welfare of the child [that]

must control the decision of the court. . . . In making this determination, the trial court is vested with broad discretion which can . . . be interfered with [only] upon a clear showing that that discretion was abused." (Internal quotation marks omitted.) *Zhou* v. *Zhang*, supra, 334 Conn. 632. A trial court properly may rely on testimony from a guardian ad litem in determining the best interests of the children regarding custody. See id., 628–30; see also *In re Paulo T.*, 213 Conn. App. 858, 887 n.18, 279 A.3d 766 (2022) (same), aff'd, 347 Conn. 311, 297 A.3d 194 (2023); *Zilkha v. Zilkha*, 180 Conn. App. 143, 177, 183 A.3d 64 (in making custody determination, court may seek advice and accept recommendations from guardian ad litem, who must act as representative of children's best interests), cert. denied, 328 Conn. 937, 183 A.3d 1175 (2018). A trial court is "well within its discretion to credit the testimony of the guardian ad litem because a guardian ad litem, who is not a parent, is appointed specifically for the reason that [the guardian ad litem] is disinterested, so that [the guardian ad litem] may make recommendations to the court regarding the best interests of the children. The fact that the guardian ad litem is a disinterested or neutral witness does not require the court to adopt the guardian ad litem's recommendation." *Brown* v. *Brown*, 132 Conn. App. 30, 40, 31 A.3d 55 (2011). "In pursuit of its fact-finding function, [i]t is within the province of the trial court . . . to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses

and to draw necessary inferences therefrom." (Internal quotation marks omitted.) Id.; see also *Blum* v. *Blum*, 109 Conn. App. 316, 329, 951 A.2d 587, cert. denied, 289 Conn. 929, 958 A.2d 157 (2008). As our Supreme Court has explained, any issue pertaining to the basis for the guardian ad litem's testimony regarding the best interests of the children "affects the weight of [the] testimony rather than its admissibility." (Internal quotation marks omitted.) *Zhou* v. *Zhang*, supra, 634.

In the present case, the fact that the guardian ad litem was unable to observe a visit between N. R. and his children, despite the clear efforts made by the guardian ad litem to do so, did not render the guardian ad litem unable to issue recommendations to the court, nor did it make it improper for the court to rely on those recommendations. First, we note that the order delineating the duties of the guardian ad litem did not mandate that the guardian ad litem personally observe the children interacting with each parent. Although it required that the guardian ad litem investigate the facts necessary to make recommendations to the court related to custody and parenting time, the guardian ad litem in the present case received updates from the third-party supervisor who had observed N. R.'s visits with the children. The record shows that the guardian ad litem considered and relied in part on those reports in making recommendations to the court regarding N. R.'s ability to have parenting time with his children.[23] Second, it is unclear from the court's memorandum of decision to what extent, if indeed at all, the court relied on or credited the observations and recommendations of the guardian ad litem. Additionally, as the guardian ad litem succinctly stated in its appellate brief, "[w]hile

---

[23] The guardian ad litem testified that "all of the positive reports of the interactions between the father and the children are part of my recommendation. . . . [Y]ou know, my recommendation doesn't ask for supervised contact. It's saying that he can have the children during the day."

personally observing the children with the father would have been a useful piece of the mosaic, it would have been just that, one piece; a piece that was fulfilled by the professional visitation supervisors who did, indeed, observe interactions between N. R. and the children and [reported their findings] back to the guardian ad litem." Furthermore, given that the guardian ad litem testified at the hearing and was subject to cross-examination[24] by both N. R. and M. P., the court was able to consider the basis for the guardian ad litem's observations and recommendations, and to afford them whatever weight it deemed appropriate.[25] It was for the trial court to make that determination, which this court cannot second-guess on appeal. Under these circumstances, N. R. has failed to demonstrate any abuse of discretion by the court in relying, to whatever extent it may have, on the testimony of the guardian ad litem in making its determination of the best interests of the children.

The judgment is affirmed.

In this opinion the other judges concurred.

[24] Furthermore, we note that the guardian ad litem testified that the visits between N. R. and the children had gone well, and had previously recommended to the court that, based on the reports received from the third-party visitation supervisor, N. R. receive more, and unsupervised, visitation time with the children.

[25] We note that N. R. cross-examined the guardian ad litem about the fact that the guardian ad litem had not personally observed him interacting with the children. The following exchange ensued:

"Q. Um, have you ever seen me in those [eighteen] months [of the guardian ad litem's involvement] with my kids?

"A. No.

"Q. Okay. So, why do you even take the supervised visits if your recommendations . . . are going against what the supervised visits say?

"A. My—actually my recommendations are supported by what the supervised visits say, which is that the interaction between you and the children is appropriate. . . .

"Q. Do you find it strange that I was arrested at a supervised visit? Do you find that . . . startling?

"A. I think it could've probably happened any time. There was a warrant out for your arrest."