******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## AMANDA L. RAYMOND *v.* JUSTIN K. BRIERE
### (AC 47512)

Clark, Seeley and Palmer, Js.

*Syllabus*

The plaintiff appealed from the trial court's judgment awarding the defendant primary physical custody of the parties' minor child, M. She claimed, inter alia, that the court erred by admitting evidence of her conduct related to her efforts to research and report alleged criminal activity to law enforcement, specifically, testimony from multiple people that the plaintiff had become fixated with, inter alia, human trafficking and cyberstalking and that those beliefs and her related conduct were affecting M. *Held*:

The trial court properly considered evidence of the plaintiff's actions in reaching its decision that it was in M's best interest for the defendant to maintain primary physical custody, as, pursuant to the statute (§ 46b-56) pertaining to the issuance of custody orders, the court focused on the plaintiff's conduct and how that conduct impacted her ability to provide proper care for M.

This court declined to reverse the trial court's judgment pursuant to the plain error doctrine on the basis of the plaintiff's unpreserved claim of judicial bias, as the plaintiff did not file a motion to disqualify in the trial court and did not establish that the trial court acted in a biased or partial manner.

The trial court improperly ordered the plaintiff to undergo a psychological evaluation and comply with any treatment requirements resulting from such evaluation as part of its final custody order, as, pursuant to statute (§ 46b-6), the court's authority to issue such an order was limited to pending matters; accordingly, the judgment was reversed in part and the order to undergo a psychological evaluation was vacated.

Argued September 10—officially released December 9, 2025

*Procedural History*

Application for custody of the parties' minor child, and for other relief, brought to the Superior Court in the judicial district of New London, where the defendant filed a cross complaint; thereafter, the case was tried to the court, *Spallone, J.*; subsequently, the court, *Spallone, J.*, denied the plaintiff's motion for a continuance; judgment awarding the parties joint legal custody of the minor child and awarding the defendant primary

physical custody of the minor child, from which the plaintiff appealed to this court. *Reversed in part*; *order vacated.*

*Amanda L. Raymond*, self-represented, the appellant (plaintiff).

*Lori N. Bartinik*, for the appellee (defendant).

*Opinion*

CLARK, J. In this custody dispute, the self-represented plaintiff, Amanda L. Raymond, appeals from the judgment of the trial court awarding the defendant, Justin K. Briere, primary physical custody of their minor child, M. On appeal, the plaintiff claims that the court (1) erred by admitting evidence of the plaintiff's conduct related to her efforts to research and report alleged criminal activity to law enforcement, (2) violated her right to a fair trial by exhibiting bias in favor of the defendant, and (3) erred by ordering her to undergo a psychological evaluation and to comply with any treatment recommendations made in connection with such evaluation. We agree with the plaintiff that the court erred in ordering her to undergo a psychological evaluation but disagree with the plaintiff's remaining claims. We therefore reverse the judgment of the trial court in part and vacate the order requiring her to undergo a psychological evaluation. We affirm the judgment in all other respects.

The following facts and procedural history are relevant to this appeal. The parties, who were never married, are the parents of M, a daughter born in May, 2016. The parties lived together from the time of M's birth until they separated early in 2022. The plaintiff also had three other children from a previous relationship who lived with the parties during this time. Beginning sometime in March or April, 2019, the plaintiff became

increasingly fixated on issues related to human trafficking and cyberstalking. Eventually, the plaintiff became convinced that she was being targeted because she had gathered evidence that high-ranking government officials were involved in human trafficking and that those officials created the COVID-19 pandemic to distract attention from their illegal activities. The trial court found that, "during the period leading up to the parties' separation and after, [the plaintiff] spent a great deal of time researching these issues and taking certain actions based on her research. The [plaintiff's] actions included, but were not limited to, not leaving the house for long periods of time, conducting research late into the night and sleeping late the next morning, painting the walls of the house with paint designed to disrupt attempts to interfere with or capture private information conveyed through wireless means, attempting to protect her electronic devices from intrusion or hacking through various means, attempting to create a Faraday room[1] and wearing a metal object to further disrupt electronic intrusion. Further, the [plaintiff] was engaged in research and frequent communication with law enforcement and others regarding her concerns about human trafficking, and, in particular, her concern that she might be the target of human traffickers." (Footnote added.)

---

[1] Named after scientist Michael Faraday, a "Faraday room" or "Faraday cage" is an enclosure made of material that shields the interior from electromagnetic radiation, thereby preventing objects within the enclosure from sending or receiving electromagnetic transmissions. See F. Fungsang, "U.S. E-Passports: ETA August 2006: Recent Changes Provide Additional Protection for Biometric Information Contained in U.S. Electronic Passports," 2 I/S: A Journal of Law & Policy for the Information Society 521, 535 (2006); see also S. R. Carter III, "The Sound of Silence: Why and How the FCC Should Permit Private Property Owners to Jam Cell Phones," 28 Rutgers Computer & Tech. L.J. 343, 361 (2002) ("A Faraday Cage is a metal grid that blocks a conductor's electric charge. Thus, the electric charge remains on the outer surface of the cage and no electrostatic field is present within the cage. Hence, cell phones within the cage cannot send or receive their signals." (Footnotes omitted.)).

On April 27, 2022, the plaintiff filed an application for custody, in which she sought primary physical custody of M and requested that the court enter an order establishing a visitation schedule. On the same date, the plaintiff also filed an application for an emergency ex parte order of custody (ex parte application) pursuant to General Statutes § 46b-56f (a).[2] The plaintiff's ex parte application sought substantially the same relief with respect to custody and visitation as her underlying custody application, but also requested, inter alia, that the court order the defendant "not [to] withhold [M] from [the plaintiff]" and to grant the plaintiff "[f]inal decision-making authority . . . since [the defendant] has refused to respond and facilitate access with [the plaintiff] and siblings, has refused to return [M] to the home she has known for almost [six] years, and is unwilling to make rational, non-emotional decisions that affect [M's] emotional well-being and foster her relationships with her immediate family." In support of her ex parte application, the plaintiff alleged that the parties previously had agreed to share physical custody but that the defendant failed to return M to the plaintiff's home in accordance with that agreement, would not tell the plaintiff when he intended to do so, and refused to communicate with her regarding custody issues.

Later that day, the defendant filed a competing ex parte application seeking temporary sole legal and physical custody of M.[3] In support of his application, the defendant alleged that the plaintiff "suffered from delusions and paranoia since October, 2019," regarding her

[2] General Statutes § 46b-56f (a) provides: "Any person seeking custody of a minor child pursuant to section 46b-56 or pursuant to an action brought under section 46b-40 may make an application to the Superior Court for an emergency ex parte order of custody when such person believes an immediate and present risk of physical danger or psychological harm to the child exists."

[3] Although the trial court docket indicates that the defendant's ex parte application was filed on April 28, 2022, both the application and the court's initial order on that application are dated April 27, 2022.

fixation with human trafficking and cyberstalking, and that those delusions "have significantly worsened over the last two years . . . ." The defendant further alleged that M was "becoming convinced that [she was] being stalked and hacked and that an electronic frequency gun [was] being pointed at the house to harm [her]" and that he was "concerned that [M] [was] not safe in [the plaintiff's] care due to this increasingly bizarre behavior." In addition to temporary sole legal and physical custody, the defendant requested that the plaintiff be required to undergo a psychiatric evaluation and that her visitation with M be supervised "unless and until [her] mental health concerns are properly addressed."

On April 27, 2022, the court, *Spallone, J.*, granted the plaintiff's ex parte application in substantial part, ordering that the parties share temporary legal and physical custody and that M reside primarily with the plaintiff, and setting a visitation schedule in accordance with the plaintiff's request. On the same date, the court denied the defendant's ex parte application on the basis that it had "granted another order on [April 27, 2022], which maintains shared physical custody." The court scheduled a hearing on both ex parte applications for May 10, 2022.

The hearing on the parties' ex parte applications commenced on May 10, 2022. On that date, the court permitted the defendant to present his witnesses first because the defendant had subpoenaed witnesses to testify that day. The defendant presented the testimony of Erica McCormick, an employee of the Department of Children and Families (department); Scott Raymond, the plaintiff's father; and Lucie Raymond, the plaintiff's stepmother. McCormick testified that she met with the plaintiff after the defendant called the department's Careline on April 28, 2022, to report his concerns regarding the plaintiff's mental health. On the basis of her

discussion with the plaintiff, McCormick referred the case to Ursula Moreshead, a clinical social worker for the department who was scheduled to meet with the plaintiff the following week to assess whether the plaintiff had untreated mental health needs that may impact M. Scott Raymond and Lucie Raymond both testified as to their concerns about the plaintiff's increasing fixation with issues related to human trafficking and cyberstalking and the impact it was having on M.[4] After the conclusion of Lucie Raymond's testimony, the court stated that the matter would have to be continued to a future date. Prior to adjourning for the day, the court heard argument from the parties on the ex parte applications and then modified the ex parte order to grant the defendant temporary physical custody of M and to require that the plaintiff's visitation with M "shall be at the discretion of the [defendant], supervised by a family member."

On June 8, 2022, the court held a continued hearing on the parties' ex parte applications, at which Moreshead testified concerning her assessment of the plaintiff. Moreshead recommended that the plaintiff undergo a psychiatric evaluation because her hypervigilance was at "a very heightened level" and was "impacting her functioning," and it was "important to tease out . . . whether it's a result of a long-term chronic, complex trauma . . . [and] whether it's a major mental illness." Moreshead further testified that, regardless of whether the plaintiff's beliefs about stalking and human trafficking were true, those beliefs were "dictat[ing] her line

---

[4] Scott Raymond testified that the plaintiff had become consumed by her belief that the government was stalking her, that she refused to leave her house unattended because she believed that someone would break in to steal the evidence she gathered about human trafficking, and that she believed that her cousin in Australia had been murdered by the people she was investigating because they found out that the plaintiff was talking about their illegal activities. Lucie Raymond testified that the plaintiff's children started adopting some of the plaintiff's beliefs, including refusing to use their tablets because they believed their house was under surveillance.

of thinking," and that her fixation with those issues "may impact [her children's] ability to cope with life's stressors" and "their ability to cope with life as they get older." The plaintiff began her cross-examination of Moreshead but was unable to complete it before the court adjourned for the day. The court continued the matter and left in place the modified ex parte order it had entered on May 10, 2022.

A third hearing date on the parties' ex parte applications was scheduled for July 5, 2022. At that hearing, the defendant requested that, to avoid having to repeat the presentation of evidence, the court combine the hearing on the ex parte applications with the trial on the merits of the underlying custody application and that the court enter new temporary custody orders on the underlying application. The court granted that request over the plaintiff's objection and, prior to adjourning for the day, entered a modified temporary custody order granting the defendant temporary sole physical and legal custody and requiring that the plaintiff's visitation with M be supervised by a third-party agency.

The court heard four additional days of evidence over the next fifteen months, with the evidentiary portion of the trial concluding on October 10, 2023. In the interim, the court twice entered modified temporary custody orders, both times expanding the plaintiff's custodial and visitation rights. First, on January 12, 2023, the court modified its prior order by granting the parties joint legal custody of M, removing the requirement that the plaintiff's visitation be supervised, and granting the plaintiff visitation with M two weekday evenings per week as well as Saturday from 11 a.m. until 7 p.m. On March 28, 2023, the court again modified its temporary custody order to grant the plaintiff visitation with M from Friday evening to Saturday evening, in addition

to the two weekday evenings per week set forth in the prior order.

On February 6, 2024, the court issued a final order on the plaintiff's application. The court awarded the parties joint legal custody of M but ordered that "[the defendant] shall have primary physical custody . . . and his residence shall be deemed [M's] primary residence for school purposes." The court also entered an order establishing a visitation schedule for the plaintiff and setting forth the parties' respective visitation rights during holidays and vacations. The court further ordered that "[the plaintiff] shall undergo a psychological evaluation by a psychiatrist, approved by [the defendant] (but not chosen by him . . . ) and shall be responsible for the cost incurred. . . . [The plaintiff] shall follow the recommendations for treatment made by the mental health professional and shall remain engaged in her current mental health treatment as long as clinically indicated." The court also ordered that "[t]he parties shall in all cases attempt joint decision making, however, if there is an impasse the [defendant] shall have final decision-making authority until further order of this court. This order is entered without prejudice to being revisited by the court should the [plaintiff] comply with the order regarding a psychological evaluation . . . ." Finally, the court noted that, "in reviewing the evidence available at trial . . . on more than one occasion in speaking to the [department] the [defendant] expressed an interest in returning to the prior split physical custody arrangement. Based upon all the evidence the court has received, the court believes that this would be a reasonable goal for the parties to strive for provided [that the plaintiff] receives the appropriate psychological evaluation and, if necessary, treatment." This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

We first address the plaintiff's claim that the trial court erred by considering evidence of the plaintiff's conduct related to her efforts to research and report human trafficking and cyberstalking. Although the precise nature of the plaintiff's claim is difficult to discern, the plaintiff appears to be arguing that it was improper for the court to consider such evidence because her right to report criminal activity is protected by federal law and that the court did not have jurisdiction to adjudicate the validity of her allegations regarding human trafficking and cyberstalking because those allegations involve federal crimes that can only be adjudicated by a federal court. We disagree.

The following facts and procedural history are relevant to this claim. The defendant claimed in his ex parte application and during trial on the underlying custody application that he should be granted primary physical custody of M and final decision-making authority because the plaintiff's fixation with human trafficking and cyberstalking interfered with her ability to make sound decisions regarding's M's care. In support of that claim, the defendant presented evidence concerning the plaintiff's conduct with respect to those issues and the effects that her conduct had on her parenting abilities. He testified that the plaintiff's fixation with such issues began on October 9, 2019. That night, the plaintiff handed the defendant a note stating that she had discovered a post on the website Craigslist indicating that someone was trying to kill their family. After the defendant refused to wake the children up and leave their home, the plaintiff took her computer and cell phone, went to their neighbor's house, and asked the neighbor to drive her to the police station. The neighbor instead called the police so that the plaintiff could report her allegations, but, when the officers arrived, the plaintiff became combative and refused to talk to the officers

because she believed they were imposters. The police brought the plaintiff to the hospital for a psychiatric evaluation, and she was released the next day.

The defendant presented evidence that the plaintiff's behavior became increasingly disruptive after that incident. He testified that the plaintiff believed that the police and the government were involved in human trafficking and that she was being targeted because of her research into that issue. He further testified that the plaintiff believed that the individuals allegedly involved in human trafficking were trying to gain access to her electronic devices and that there were directed energy weapons[5] targeting their home. He also presented evidence that the plaintiff took steps to prevent unwanted electromagnetic signals from entering their home, including by covering the windows in cardboard wrapped in tin foil, painting the walls with expensive metallic paint, wrapping her cell phone in tin foil and keeping it in the refrigerator, and wearing a pot on her head while she slept.

The defendant also presented evidence concerning the effect that the plaintiff's behavior had on M. For example, he testified that, during the period of time just before the plaintiff filed the custody application, the plaintiff was homeschooling the children but would spend so much time focusing on human trafficking and

---

[5] "Directed energy weapons . . . are a type of electromagnetic or particle technology which use energy, as opposed to a physical projectile, to strike a target." United Nations Institute for Disarmament Research, "Directed Energy Weapons: A New Look at an 'Old' Technology," (May 12, 2022), available at https://unidir.org/directed-energy-weapons-a-new-look-at-an-old-technology/ (last visited November 26, 2025). Directed energy weapons include high-powered lasers and high-powered microwave systems that can be used to cause temporary or permanent damage to human and electronic targets. See id.; see also Congressional Research Service, "Defense Primer: Directed-Energy Weapons," (updated November 4, 2024), available at https://www.congress.gov/crs_external_products/IF/PDF/IF11882/IF11882.12.pdf (last visited November 26, 2025).

cyberstalking that the children "would tend to themselves on very regular occasions." He further testified that M had made statements indicating that she was starting to adopt the plaintiff's beliefs, including complaining that she was hearing high-pitched noises from "directed energy weapons that [were] being blasted at [the plaintiff's] house" and repeating the plaintiff's claims "that the police and the government are involved in . . . cyberstalking and human trafficking . . . ." The defendant also testified that, approximately one year after the parties separated, M became so fearful of sleeping in her own room that she cried to the point of vomiting. When the defendant asked why she was so scared, M said that the plaintiff had told her that the defendant's home was not safe.[6]

"[A] court of this state has jurisdiction to make an initial child custody determination if . . . [t]his state is the home state of the child on the date of the commencement of the child custody proceeding . . . ." General Statutes § 46b-115k (a) (1). "Orders regarding the custody and care of minor children . . . are governed by [General Statutes] § 46b-56, which grants the court broad discretion in crafting such orders." (Internal quotation marks omitted.) *N. R.* v. *M. P.*, 227 Conn. App. 698, 714, 323 A.3d 1142 (2024). Section 46b-56 (a) provides in relevant part that, "[i]n any controversy before the Superior Court as to the custody or care of minor children . . . the court may make or modify any

_____

[6] The defendant also presented testimony from other witnesses that further supported his contention that the plaintiff's fixation with human trafficking and cyberstalking affected M. Debra Sharron, the defendant's mother, with whom the defendant lived from the time of the parties' separation through the time of trial, testified that M complained about hearing "loud squealing noises . . . [and that] she thinks it has something to do with the hacking . . . [that] was going on with [the plaintiff]." In addition, Scott Raymond and Lucie Raymond both testified that they had heard the plaintiff's children repeating some of the plaintiff's claims about cyberstalking. See footnote 4 of this opinion.

proper order regarding the custody, care, education, visitation and support of the children if it has jurisdiction . . . . Subject to the provisions of section 46b-56a, the court may assign parental responsibility for raising the child to the parents jointly, or may award custody to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. . . ." Subsection (b) of § 46b-56 provides in relevant part that, "[i]n making or modifying any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests. . . ." Finally, "[§] 46b-56 (c) directs the court, when making any order regarding the custody, care, education, visitation and support of children, to consider the best interests of the child, and in doing so [the court] may consider, but shall not be limited to, one or more of [seventeen enumerated] factors[7] . . . ." (Footnote in

---

[7] "In determining the best interests of the child, the court looks to the factors enumerated in § 46b-56 (c): '(1) The physical and emotional safety of the child; (2) the temperament and developmental needs of the child; (3) the capacity and the disposition of the parents to understand and meet the needs of the child; (4) any relevant and material information obtained from the child, including the informed preferences of the child; (5) the wishes of the child's parents as to custody; (6) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (7) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (8) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (9) the ability of each parent to be actively involved in the life of the child; (10) the child's adjustment to his or her home, school and community environments; (11) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (12) the stability

original; internal quotation marks omitted.) *N. R.* v. *M. P.*, supra, 715. Among the factors that the court may consider are "[t]he physical and emotional safety of the child"; General Statutes § 46b-56 (c) (1); and "the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child . . . ." General Statutes § 46b-56 (c) (13).

"In reaching a decision as to what is in the best interests of a child, the court is vested with broad discretion and its ruling will be reversed only upon a showing that some legal principle or right has been violated or that the discretion has been abused. . . . As our Supreme Court recently reiterated, [t]he authority to exercise the judicial discretion [authorized by § 46b-56] . . . is not conferred [on] [the state's appellate courts], but [on] the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one [that] discloses a clear abuse of discretion can warrant our interference." (Internal quotation marks omitted.) *N. R.* v. *M. P.*, supra, 227 Conn. App. 716.

of the child's existing or proposed residences, or both; (13) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (14) the child's cultural background; (15) the effect on the child of the actions of an abuser, if any domestic violence, as defined in section 46b-1, has occurred between the parents or between a parent and another individual or the child; (16) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (17) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b.' General Statutes § 46b-56 (c)." *N. R.* v. *M. P.*, supra, 227 Conn. App. 715 n.15.

In the present case, the court had jurisdiction to enter child custody orders pursuant to § 46b-115k (a) (1) because the plaintiff, the defendant, and M all resided in Connecticut as of the commencement date of this action. In entering such orders, § 46b-56 directed the court to "(b) . . . enter orders . . . that serve the best interests of [M] and provide [M] with the active and consistent involvement of both parents *commensurate with their abilities and interests*," and authorized the court to take into account "(c) . . . (1) [t]he physical and emotional safety of the child" and "(13) the mental and physical health of all individuals involved . . . ." (Emphasis added.) Evidence of actions taken by the plaintiff as a result of her beliefs regarding human trafficking and cyberstalking was relevant to the court's determination as to the custodial arrangement that would serve the best interests of M. The plaintiff cites no authority for her claim that it was improper for the court to consider that evidence merely because jurisdiction over a hypothetical future prosecution arising from the alleged human trafficking and cyberstalking activity is vested in another court. Contrary to the plaintiff's contention, the court did not "decide the validity of [her] allegations of human trafficking," and nothing in the court's decision would prevent a future prosecution based on those allegations. Rather, the court properly focused on the plaintiff's conduct and how that conduct impacted her ability to provide proper care for M. As Moreshead testified, regardless of whether the plaintiff's beliefs about human trafficking and cyberstalking were true, the actions she took as a result of those beliefs had the potential to impact M's development. The court properly considered evidence of the plaintiff's actions in reaching its decision that it was in M's best interest for the defendant to maintain primary physical custody.

## II

We next address the plaintiff's claim that the trial court deprived her of her right to a fair trial by exhibiting bias in favor of the defendant. The plaintiff contends that various rulings by the court demonstrated that the court was biased against her and that those rulings "show advocacy for the represented defense for which no [self-represented] litigant could fairly defend or overcome, violating due process rights to an impartial judiciary." We disagree with the plaintiff's claim.

The following facts and procedural history are relevant to this claim. On March 31, 2023, the court issued a notice indicating that the next trial date—the seventh day of evidence—would be held on May 5, 2023. On April 25, 2023, the plaintiff filed a motion styled as a "motion for extension of time to file a motion to recuse/ disqualify," in which she requested "an extension of time to file [a motion to disqualify] to May 1, 2023 . . . ." The court, *Shluger, J.*, granted the plaintiff's motion.[8] On May 3, 2023, the plaintiff filed a motion for a continuance of the May 5, 2023 trial date, in which she indicated that she had intended to file a motion to disqualify Judge Spallone by May 1, but was unable to do so because of a family illness. The court, *Spallone, J.*, granted her motion. The plaintiff, however, did not file a motion to disqualify, and, on September 21, 2023, the court issued a notice indicating that the trial would resume on October 10, 2023.

At the outset of the October 10, 2023 hearing, the plaintiff stated that, before resuming evidence, she wanted "to address numerous areas of professional misconduct" and "biased rulings" but that she was not

---

[8] It is not clear why the plaintiff filed a motion for extension of time to file a motion to disqualify. Our review of the record indicates that the plaintiff had not previously notified the trial court that she intended to file a motion to disqualify, and it does not appear that the court ever imposed a deadline to file such a motion.

prepared at that time. The plaintiff further stated that she wanted to address those issues on the record because, "in order for [the issues] to be addressed on appeal, they would have to be addressed in the trial court." The defendant objected, arguing that the case had been continued for six months to give the plaintiff the opportunity to file a motion to disqualify and that delaying the matter further would cause undue prejudice to the defendant. The court declined to continue the matter, noting that the plaintiff had been given ample opportunity to file a motion to disqualify and would have the right to appeal after final judgment entered if she "[felt] like the court for some reason has made other errors or not been impartial . . . ."[9] The parties completed their presentation of evidence and presented closing argument that day, and the court indicated that it would issue a written ruling in due course. The plaintiff did not file a motion to disqualify after the close of evidence, and, on February 6, 2024, the court issued a final order on the custody application.[10]

Practice Book § 1-23 provides in relevant part that "[a] motion to disqualify a judicial authority shall be in writing and shall be accompanied by an affidavit setting

---

[9] The court granted the plaintiff a short recess to print and prepare exhibits that she intended to present that day and her proposed custody orders.

[10] On October 20, 2023, the plaintiff filed a "motion for extension of time to file a motion for mistrial or new trial," in which she indicated that she intended to file a motion for mistrial or new trial "in accordance with [Practice Book] §§ 16-35, 17-4A, and 40-5 . . . ." The plaintiff further indicated that the motion would "address numerous procedural errors and misconduct" that "render[ed] the trial unfair, bias[ed], and prejudicial," and requested that the court extend the time to file such motion to November 20, 2023. The court denied the plaintiff's motion "without prejudice as the court has not yet issued a decision on the merits." We note that §§ 16-35 and 17-4A govern postjudgment motions in civil jury and court trials, respectively, and require such motions to be filed after the court accepts a jury verdict or renders judgment in a court trial. Section 40-5 pertains to the remedies available in criminal proceedings when a party fails to comply with the rules of discovery.

forth the facts relied upon to show the grounds for disqualification and a certificate of the counsel of record that the motion is made in good faith. . . .” “Claims alleging judicial bias should be raised at trial by a motion for disqualification or the claim will be deemed to be waived. . . . A party’s failure to raise a claim of disqualification at trial has been characterized as the functional equivalent of consenting to the judge’s presence at trial.” (Internal quotation marks omitted.) *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 316, 991 A.2d 666, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010). Nevertheless, “[b]ecause an accusation of judicial bias or prejudice strikes at the very core of judicial integrity and tends to undermine public confidence in the established judiciary . . . we . . . have reviewed unpreserved claims of judicial bias under the plain error doctrine. . . . Plain error exists only in truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings.” (Internal quotation marks omitted.) Id., 317; see also *Emerick* v. *Emerick*, 170 Conn. App. 368, 374, 154 A.3d 1069 (addressing judicial bias claim despite party’s failure to file written motion), cert. denied, 327 Conn. 922, 171 A.3d 60 (2017); *McGuire* v. *McGuire*, 102 Conn. App. 79, 83–84, 924 A.2d 886 (2007) (reviewing unpreserved judicial bias claim under plain error doctrine despite appellant’s failure to request plain error review).

“Canon 3 (c) (1) of the Code of Judicial Conduct provides in relevant part: ‘A judge should disqualify himself or herself in a proceeding in which the judge’s impartiality might reasonably be questioned, including but not limited to instances where: (A) the judge has a personal bias or prejudice concerning a party. . . .’ The plaintiff is not required to demonstrate actual bias in order to prevail on a claim of a violation of that canon. The plaintiff will meet his burden if he can prove

that the conduct in question gave rise to a reasonable appearance of impropriety." *McGuire* v. *McGuire*, supra, 102 Conn. App. 84.

"In assessing a claim of judicial bias, we are mindful that adverse rulings, alone, provide an insufficient basis for finding bias even when those rulings may be erroneous. . . . [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (Emphasis omitted; internal quotation marks omitted.) *Johnson* v. *Johnson*, 203 Conn. App. 405, 414, 248 A.3d 796 (2021).

In support of her judicial bias claim, the plaintiff identifies various adverse procedural and evidentiary rulings that, she claims, "[show] a high degree of favoritism for the defense, or opposition to the plaintiff, that would make it impossible for a fair trial." The plaintiff also contends that the temporary custody orders entered by the court during the pendency of the proceedings, pursuant to which the defendant maintained primary physical custody of M, "gave another unfair procedural advantage to the defense, contrary to the statutory and constitutional rights of the plaintiff . . . ." The plaintiff, however, does not identify any statements by the court or other actions that reasonably may be interpreted as demonstrating "a deep-seated favoritism or antagonism" on the part of the trial court.

(Internal quotation marks omitted.) *Johnson* v. *Johnson*, supra, 203 Conn. App. 414. To the contrary, our thorough review of the record indicates that the court properly considered the arguments and objections raised by the parties and entered rulings in a fair and impartial manner based on the merits of the arguments presented. "The fact that the plaintiff strongly disagrees with the substance of the court's rulings does not make those rulings evidence of bias." *Burns* v. *Quinnipiac University*, supra, 120 Conn. App. 317. Moreover, we reiterate that reversal under the plain error doctrine is reserved for the rare circumstance in which "the alleged error is both so clear and so harmful that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Diaz*, 348 Conn. 750, 763, 311 A.3d 714 (2024). Because the plaintiff has not established that the trial court acted in a biased or partial manner, we conclude that reversal under the plain error doctrine is not warranted.

## III

The plaintiff's final claim is that the court erred by ordering her to undergo a psychological evaluation and to comply with any recommendations for treatment included in the evaluation. The defendant acknowledges that the court's order requiring the plaintiff to undergo a psychological evaluation was "arguably improper" but argues that the proper remedy is to vacate that portion of the court's final custody order while leaving the rest of the order intact. We agree that the court improperly ordered the plaintiff to undergo a postjudgment psychological evaluation and that the proper remedy is to vacate that portion of the final custody order.[11]

---

[11] In her appellate brief, the plaintiff's primary argument with respect to this claim is that the court's order for her to undergo a psychological evaluation and comply with treatment recommendations violates the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. Because we conclude that

The court's authority to order a party to undergo a psychological evaluation is governed by General Statutes §§ 46b-3 and 46b-6. Section 46b-6 provides in relevant part: "In any *pending* family relations matter the court or any judge may cause an investigation to be made with respect to any circumstance of the matter which may be helpful or material or relevant to a proper disposition of the case. . . ." (Emphasis added.) Section 46b-3 (a) provides in relevant part: "For the purposes of any investigation or pretrial conference the judge presiding at any family relations session may employ the services of any . . . physician, psychologist, psychiatrist or family counselor. . . ."

"In accordance with the plain language of § 46b-6 . . . it is well settled that the court's authority to order such an evaluation is restricted to *pending* matters to assist in the disposition of the issues presented therein." (Emphasis in original.) *Lehane* v. *Murray*, 215 Conn. App. 305, 319, 283 A.3d 62 (2022); see also *Janik* v. *Janik*, 61 Conn. App. 175, 180, 763 A.2d 65 (2000), cert. denied, 255 Conn. 940, 768 A.2d 949 (2001); *Savage* v. *Savage*, 25 Conn. App. 693, 700–701, 596 A.2d 23 (1991). As we explained in *Janik*, "§§ 46b-6 and 46b-3, refer to *pending* family relations matters only and, moreover . . . the utility of such evaluations lies in their ability to shed light on the facts of a particular case so that it may be disposed of properly. . . . Once a case has been disposed of by the rendition of a final judgment and there is nothing further pending [as was the case here] there is no longer a reason for ordering an ongoing evaluation." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Janik* v. *Janik*, supra, 179.

the trial court lacked statutory authority to order the plaintiff to undergo a psychological evaluation and treatment after it made a final custody determination, we need not address the plaintiff's contention that the court's order violated the Americans with Disabilities Act.

In the present case, the trial court ordered the plaintiff to undergo a psychological evaluation as part of its final custody order. The court did not order the plaintiff to undergo that evaluation to determine which custodial arrangement was in the best interest of M or otherwise to aid in the court's disposition of the case. Although the provision of the order granting the defendant final decision-making authority stated that it was "entered without prejudice to [being] revisited by the court should the [plaintiff] comply with the order regarding a psychological evaluation," it is undisputed that the order constituted a final custody award. Moreover, because the court's order was a final judgment on the parties' competing custody applications and not an interim order pending final disposition, the "without prejudice" provision in the court's order can only be construed as a recognition by the court of the plaintiff's statutory right to move for modification of the final custody order pursuant to § 46b-56. See, e.g., *Lynch* v. *Lynch*, 135 Conn. App. 40, 56, 43 A.3d 667 (2012) ("[t]he court . . . retains continuing jurisdiction to modify final orders for . . . the care, custody and visitation of minor children, subject to proof of certain conditions as provided in . . . [§] 46b-56" (internal quotation marks omitted)). Accordingly, we conclude that the trial court erred in ordering the plaintiff to undergo a postjudgment psychological evaluation. As a result, that aspect of the court's custody order must be vacated. See *Lehane* v. *Murray*, supra, 215 Conn. App. 321–22; *Janik* v. *Janik*, supra, 61 Conn. App. 180.

The judgment is reversed only as to the order requiring the plaintiff to undergo a psychological evaluation and comply with any treatment recommendations resulting from such evaluation and that order is vacated; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.